NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

KENTUCKY MAY COAL COMPANY,
INC., Respondent.

No. 95–5837.

United States Court of Appeals,
Sixth Circuit.

Argued May 23, 1996.

Decided July 17, 1996.

David Habenstreit (argued), National Labor Relations Board, Office of the General Counsel, Washington, DC, Aileen A. Armstrong, Deputy Associate Gen. Counsel (briefed), Linda Dreeben, National Labor Relations Board, Appellate Court Branch, Washington, DC, for Petitioner.

Barbara L. Krause (briefed), Smith, Heenan & Althen, Washington, DC, Forrest H. Roles (argued and briefed), Smith, Heenan & Althen, Charleston, WV, for Respondent.

Before: RYAN and NORRIS, Circuit Judges; DOWD, District Judge.[*]

DOWD, District Judge.

## I.

This case is before the court on application of the National Labor Relations Board ("NLRB" or "Board") for enforcement of a final order against Kentucky May Coal Company, Inc.—River Division ("Kentucky May" or "Company") issued on April 27, 1995. The Board's order requires Kentucky May to cease and desist from certain specified unfair labor practices; to rescind a contract entered into with Double C Construction, Ltd. ("Double C"); to reinstate the wage rates in effect prior to the changes, if requested by the United Mine Workers of America ("Union"); to reinstate employees laid off on the date Double C began its operations; to recognize and bargain with the Union without an election; and to post a specified Notice to Employees.

## II.

The relevant facts are set forth in some detail in the April 27, 1995 Decision and Order of the Board. JA, pp. 6–10, 1995 WL 250554. Only a brief summary is necessary for our purposes.

---

[*] The Honorable David D. Dowd, Jr., United States District Judge for the Northern District of Ohio, sitting by designation.

Near the end of January, 1994, several employees of respondent Kentucky May, a wholly owned subsidiary of Electric Fuels Corporation, were becoming increasingly concerned about the inadequacy of their production bonuses. The employees, convinced that their only hope was to organize, contacted the Union to make inquiry as to the process. Within a couple weeks, 20 of the 26 employees had signed union authorization cards. Almost immediately, Kentucky May managers and supervisors, along with decision-makers at Electric Fuels, became aware of the union-organizing activities and began to put pressure on the employees not to unionize. Management also entered into rapid negotiations with Double C, with an eye toward contracting out to Double C the operations at Kentucky May's River Dock facility on the Big Sandy River in Boyd County, Kentucky, and the nearby No. 5 Coal Yard and Crushing Facility. Contracts were signed on February 11, 1994 and Double C's operations were to commence on February 14, 1994.

On February 13, 1994, a union-organizing meeting was held. On February 14, 1994, when the Kentucky May employees reported for work, they were notified that the dock operations had been contracted out and that they were all permanently laid off. Within the next week most of Kentucky May's employees were hired by Double C.[1] Shortly after, the President of Double C gave the former Kentucky May employees pre-paid envelopes addressed to the Union which contained a typewritten note that stated: "I, _____, want to revoke my card I sent you. I want my privileges back." JA, pp. 108–109, 118, 263.

Acting on unfair labor practice charges filed by the Union, the Board's Regional Director issued an unfair labor practices complaint alleging that Kentucky May had violated Sections 8(a)(1) and (3) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1) and (3) (the "Act"). Ultimately, an amended consolidated complaint alleged

that Kentucky May interfered with its employees' rights under the Act and retaliated against its employees because of their union organizing activities. Kentucky May denied the allegations.

On May 24, 1994, pursuant to Section 10(j) of the Act, 29 U.S.C. § 160(j), the Regional Director filed in the U.S. District Court for the Eastern District of Kentucky a verified petition for temporary injunction pending final Board disposition. The issue before the district court was whether there was reasonable cause to believe that violations of the Act had occurred and, if so, whether injunctive relief was just and proper.

In August of 1994, while the Board's Section 10(j) petition was pending, an unfair labor practices hearing was conducted by an Administrative Law Judge ("ALJ"). By mutual agreement of all parties, the entire record made before the ALJ was submitted to the district court considering the petition for injunction. On December 21, 1994, the district court entered an order denying the petition for temporary injunction, finding no reasonable cause to believe that Kentucky May's subcontracting to Double C violated the Act. The court also separately concluded that an injunction would not be just and proper. *Frye v. Kentucky May Coal Co. Inc.*, 148 L.R.R.M. 2945, 1994 WL 739464 (E.D.Ky.1994). On February 27, 1995, the Board appealed the district court's denial of the Section 10(j) injunction; however, because the appeal was not timely and the district court had denied an extension of time within which to appeal, the appeal was dismissed on April 24, 1995.

On January 9, 1995, Kentucky May filed a motion with the ALJ for leave to amend its answer to plead collateral estoppel based on the district court's findings. On January 26, 1995, the ALJ issued his decision in favor of the NLRB. The order of the ALJ also denied leave to amend the answer. Exceptions and cross-exceptions were filed and, on April 27, 1995, the Board issued a Decision and

1. In the late Fall of 1994, Kentucky May terminated its contract with Double C and entered into a contract with Island Fork Construction Company, which agreed to provide the same services at a lower price. Island Fork hired its workforce from Double C. On May 13, 1995, Kentucky May terminated its contract with Island Fork and resumed its own operation of the River Dock and No. 5 Yard.

Order upholding the ALJ's decision in all respects.

## III.

### A. The Issue of Collateral Estoppel

■ Kentucky May argues on appeal that the district court's denial of the Board's Section 10(j) petition for temporary injunction and this court's order dismissing the appeal collaterally estop the Board from ruling in a subsequent unfair labor practices proceeding.

■ "The doctrine of collateral estoppel dictates that once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." *N.A.A.C.P., Detroit Branch v. Detroit Police Officers Ass'n*, 821 F.2d 328, 330 (6th Cir. 1987) (internal quotation marks and citations omitted). Four requirements must be met for preclusion to apply:

(1) the precise issue raised in the present case must have been raised and actually litigated in the prior proceeding;

(2) determination of the issue must have been necessary to the outcome of the prior proceeding;

(3) the prior proceeding must have resulted in a final judgment on the merits; and

(4) the party against whom estoppel is sought must have had a full and fair opportunity to litigate the issue in the prior proceeding.

*Id.* (footnotes omitted).

In support of its collateral estoppel argument, Kentucky May relies heavily on this court's decision in *Marlene Industries Corp. v. N.L.R.B.*, 712 F.2d 1011 (6th Cir.1983). *Marlene*, however, was a case where the question of collateral estoppel came before this court under very different procedural circumstances. In *Marlene*, the employer had already been found by the Board to have engaged in unfair labor practices, a decision which had been made final by an enforcement order of this court, including an injunction against further unfair labor prac-

tices. *See Decaturville Sportswear Co., Inc. v. N.L.R.B.*, 406 F.2d 886 (6th Cir.1969). When Marlene again engaged in unfair labor practices, the Board filed a contempt petition with this Court which appointed a Special Master to handle the proceedings. The Board, accepting his findings of fact but not his conclusions of law, challenged the conclusions. This court adopted the Special Master's findings, conclusions and recommendations. *See N.L.R.B. v. Decaturville Sportswear Co., Inc.*, 518 F.2d 788 (6th Cir.), *cert. denied*, 423 U.S. 913, 96 S.Ct. 217, 46 L.Ed.2d 141 (1975). In 1976, the Board filed another unfair labor practices charge predicated on the same incident that had triggered the original charge. Relying on the contempt proceeding, an ALJ recommended dismissal of the charge based on res judicata and collateral estoppel. The NLRB reversed the ALJ and Marlene appealed, arguing, *inter alia*, that the Board was bound by the prior findings and conclusions of the Special Master. This court agreed.[2]

The contempt proceeding in *Marlene* was an independent action brought in this court to enforce a matter already adjudged. In the case at bar, the unfair labor practices charge had not yet been adjudicated by the Board at the time the collateral proceeding for a temporary injunction under Section 10(j) was brought before the district court. The task of the district court was narrow: first, to ascertain whether there was reasonable cause to believe an unfair labor practice had occurred and, second, if there was reasonable cause, to decide whether injunctive relief would be just and proper. *Fleischut v. Nixon Detroit Diesel, Inc.*, 859 F.2d 26, 29 (6th Cir.1988). It was not the role of the district court, in the first instance, to determine the merits of the unfair labor practices charge. In fact, the *Fleischut* court specifically cautioned that, when district courts are determining whether reasonable cause exists to believe that an unfair labor practice has occurred, "[they] are *not* to adjudicate the merits of the unfair labor practice case[ ] [because] [t]he question of whether a violation of the Act has been committed is a

---

2. The case, however, was remanded on other grounds.

function reserved exclusively to the Board, subject to appellate court review of the final Board orders." *Fleischut*, 859 F.2d at 28 (emphasis in original) (citing *Levine v. C & W Mining, Inc.*, 610 F.2d 432, 435 (6th Cir. 1979)). As the Seventh Circuit has aptly pointed out, in a Section 10(j) proceeding "[t]he court . . . must attempt to predict what the eventual outcome of the Board's proceedings will be and to act accordingly." *N.L.R.B. v. Q-1 Motor Express, Inc.*, 25 F.3d 473, 477 n. 3 (7th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 729, 130 L.Ed.2d 633 (1995). Therefore, "[i]f the eventual outcome turns out to be different from what was predicted, . . . it is obviously the prediction, not the outcome, that must be rejected." *Id.*; *see also Coronet Foods, Inc. v. N.L.R.B.*, 981 F.2d 1284, 1288 (D.C.Cir.1993) ("a district court finding in a section 10(j) auxiliary proceeding would [not] later bind the NLRB when ruling, definitively, on the unfair labor practice charge and the remedy appropriate thereto"); *N.L.R.B. v. S.E. Nichols, Inc.*, 862 F.2d 952, 957 (2d Cir.1988) ("findings made on a motion for temporary injunction under section 10(j) are not determinative of the merits in a subsequent unfair labor practice proceeding"), *cert. denied,* 490 U.S. 1108, 109 S.Ct. 3162, 104 L.Ed.2d 1025 (1989); *N.L.R.B. v. Acker Industries, Inc.*, 460 F.2d 649, 652 (10th Cir.1972) (Section 10(j) proceedings are not final adjudications as to whether an unfair labor practice has occurred). As the *Coronet Foods* court noted, the Act "anticipates court review, not preview, of the Board's first instance decisions as primary adjudicator of unfair labor practices[.]" *Id.*

The NLRA provides that the Board has exclusive jurisdiction to render initial decisions in these labor matters and the courts merely review such decisions under a "substantial evidence" standard. *See* 29 U.S.C. § 160. This is not affected by the fact that the district court judge who heard the Section 10(j) petition had before him the same record that the ALJ had in the unfair labor practices proceeding. The district court recognized the limits of it own ruling when, in the context of its discussion of whether a temporary injunction would be just and proper, it stated:

> Petitioner [NLRB] has not demonstrated that the requested injunction is necessary to preserve its remedial power. There is no evidence that the Board, *following proper resolution of the underlying unfair labor practices*, would not be capable of fashioning an adequate remedy. . . .

*Frye v. Kentucky May Coal Co.*, 148 L.R.R.M. at 2948 (emphasis added).[3]

Thus, in the instant case, Kentucky May's reliance on *Marlene* is misplaced. The district court did not pass on whether an unfair labor practice had been committed. That determination was properly left for the Board. The findings of the district court in the Section 10(j) proceeding did not preclude contrary findings by the NLRB in the unfair labor practices proceeding. The two proceedings presented different issues to their respective finders of fact.[4] We conclude that there is no collateral estoppel because none of the four requirements have been met.

There being no merit to respondent's first argument, it is overruled.

3. Contrary to the respondent's position, *S.E. Nichols, Inc., supra*, does not stand for the proposition that a district court's finding of no reasonable cause would typically be preclusive of contrary findings by the Board. The *S.E. Nichols* court, in fact, made clear that its affirmance of the district court's denial of a Section 10(j) petition would have no effect upon then pending Board proceedings. 862 F.2d at 957.

4. In its brief at page 15, Kentucky May states that "[t]he Board chose to bring a Section 10(j) action against Kentucky May[,]" implying that the Board did so at its peril. There is nothing in the NLRA which would suggest that, by permit-

ting the Board the option of pursuing Section 10(j) interim relief, Congress intended that the Board would thereby abdicate to the courts its primary role of determining unfair labor practice questions. If, as Kentucky May argues, a district court's finding of "no reasonable cause" virtually automatically precludes an NLRB finding that an employer has engaged in an unfair labor practice, every case in which a court denied a temporary injunction on the "no reasonable cause" ground would be taken out of the hands of the NLRB. The district courts, rather than the NLRB, would be deciding these labor matters. This was clearly not the intent of Congress.

### B. The Question of Summary Affirmance of the ALJ's Findings

■ The ALJ made several findings of fact which the Board affirmed.[5] The Board argues here that Kentucky May's failure to contest the findings of the ALJ as affirmed by the Board entitles it to summary enforcement with respect to the portions of the Board's order that are based on those uncontested findings.

This court has stated that failure to address or take issue with the Board's findings and conclusions with regard to Section 8(a)(1) violations effectively results in abandonment of the right to object to those determinations. *N.L.R.B. v. Valley Plaza, Inc.*, 715 F.2d 237, 240–241 (6th Cir.1983) (citing *N.L.R.B. v. Tennessee Packers, Inc.*, 344 F.2d 948, 949 (6th Cir.1965); *Dreis & Krump Mfg. Co., Inc. v. N.L.R.B.*, 544 F.2d 320 (7th Cir.1976)).

By its failure to contest the ALJ's findings of fact Kentucky May has abandoned its right to object and has effectively admitted the truth of those findings. This, however, does not end the inquiry: we must now determine whether, given those uncontested findings, there was substantial evidence to support the Board's decision.

### C. The Question of Substantial Evidence

■ Section 8(a)(3) of the Act makes it an unfair labor practice for an employer "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization[.]" 29 U.S.C. § 158(a)(3). If substantial evidence supports the Board's finding that the employees' protected activity was "a motivating factor" behind the employer's adverse action,

that action is unlawful unless the record considered as a whole supports the employer's affirmative defense that it would have taken the same action in the absence of the protected activity. *N.L.R.B. v. Transportation Management Corp.*, 462 U.S. 393, 395, 397–403, 103 S.Ct. 2469, 2471, 2472–2475, 76 L.Ed.2d 667 (1983).

■ The initial burden of showing an unfair labor practice is on the Board. If the Board meets that burden, the employer must then show by a preponderance of the evidence that it would have taken the same action even if the employees had not engaged in protected activity. *Birch Run Welding & Fabricating, Inc. v. N.L.R.B.*, 761 F.2d 1175, 1179 (6th Cir.1985) (citing *N.L.R.B. v. Transportation Management Corp.*, 462 U.S. at 395, 103 S.Ct. at 2471).

■ The Supreme Court has defined "substantial evidence" as "more than a mere scintilla" and as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938). "[I]t must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." *N.L.R.B. v. Columbian Enameling & Stamping Co., Inc.*, 306 U.S. 292, 300, 59 S.Ct. 501, 505, 83 L.Ed. 660 (1939). "This is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Federal Maritime Commission*, 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966).[6] "In

---

5. The ALJ found that the Company violated Section 8(a)(1) in several ways: by unlawfully interrogating and threatening employees regarding their union activities and extent of union support; by threatening retaliation in the form of loss of jobs, discharge and plant closure; by impermissibly soliciting grievances; by attempting to coerce employees not to unionize by telling them that such action would be futile; by impermissibly telling the employees that their union activities had caused their lay-offs; by unlawfully soliciting employees to refrain from engaging in protected activity; and by unlawfully soliciting employees to withdraw their union support. The

ALJ also found that Kentucky May violated Section 8(a)(1) and (3) by changing the terms and conditions of the employment of Stevens and Bush to discourage their union activities. Finally the ALJ found that Double C President Stanley and Foremen Pettit and Webb were acting as agents of Kentucky May when they committed some of the above violations.

6. Improper motivation need not be proven by direct evidence but may be inferred from all the circumstances. *See N.L.R.B. v. G & S Metal Products Co., Inc.*, 489 F.2d 441, 443 (6th Cir. 1973); *N.L.R.B. v. Buckhorn Hazard Coal Corp.,*

reviewing the credibility findings and the inferences drawn by the Board from the evidence, the test for a reviewing court is whether the conclusions are reasonable in light of the proven facts. Thus, this court may not substitute its judgment on the question of whether the inference drawn is the correct one or whether a different inference would be better supported; rather, this court is limited to the determination of reasonableness—not rightness." *N.L.R.B. v. Paschall Truck Lines, Inc.*, 469 F.2d 74, 76 (6th Cir. 1972) (citing *N.L.R.B. v. Nevada Consolidated Copper Corp.*, 316 U.S. 105, 106, 62 S.Ct. 960, 961, 86 L.Ed. 1305 (1942); *Radio Officers' Union v. N.L.R.B.*, 347 U.S. 17, 48–50, 74 S.Ct. 323, 340–341, 98 L.Ed. 455 (1954)).

■ Notwithstanding Kentucky May's argument to the contrary, substantial evidence does support the Board's finding that the employees' union-organizing activity was a motivating factor in Kentucky May's decision to contract out its river operations and lay off its employees in February of 1994. The ALJ set forth fact after fact, none of which have been challenged here on the merits, establishing a very strong anti-union animus on the part of Kentucky May and its parent company.

■ Kentucky May has also failed to show that it would have taken the same action—i.e., contracting out its River Dock operations to Double C—notwithstanding the employees' protected activity. Although there is evidence that David Carter, Electric Fuels' senior vice president of operations, first raised the possibility of contracting out mining operations in October of 1993, a reasonable inference can be drawn from the record as a whole that little, if any, action was taken on this recommendation until the Company became aware that its employees were beginning a union organizing campaign.[7] Thereafter, discussions began and negotiations were completed for the contract with Double C in an unusually short amount of time, with the result being that employees were laid off one day after their first official union-organizing meeting. When these facts are viewed in light of the various facts found by the ALJ and uncontested by the Company, and in light of various anti-union remarks made by Company agents, reasonable minds could conclude that the Company was working as fast as it could to contract out its operations before a union could get off the ground.

Accordingly, we find that there was substantial evidence to support the Board's conclusion that Kentucky May engaged in unfair labor practices. Further, Kentucky May has failed to established its affirmative defense that it would have taken the same actions notwithstanding the employees' protected activity.

### D. The Challenge to the Board's Bargaining Order

■ The Board argues that the Company's challenge to the bargaining order is not before this court because Kentucky May failed to raise any objections to the order before the Board. The Board also argues that the Company did not file exceptions to the ALJ's findings that the Union enjoyed majority support and that the Company's unfair labor practices would make a fair election unlikely.

In exceptions to the ALJ's decision which were filed on March 9, 1995, Kentucky May stated:

9. Kentucky May objects to that portion of the judge's remedial order requiring Kentucky May to recognize and bargain with the Union.

472 F.2d 53, 55 (6th Cir.1973); *N.L.R.B. v. Lawson Printers, Inc.*, 408 F.2d 1004, 1005 (6th Cir. 1969).

7. The Board reasonably inferred that the Company officials responsible for the sub-contracting decision had knowledge of the union campaign prior to making their decision. The employees' very first contact with the Union in late January of 1994 was inspired by Foreman Pettit's remark that they needed to organize. It was reasonable to infer from the subsequent anti-union conduct of various Company agents over the next couple weeks that word of the union organizing spread rapidly throughout management. Further, on February 10, when Foreman Pettit threatened that the facility would be closed if the employees unionized, he attributed this threat to Fred Verardi, Electric Fuels' Director of Operations, who was the ultimate decision-maker.

10. Kentucky May objects to the judge's conclusion that a broad order is either an appropriate or necessary remedy.

(Record, Vol. III, at 03.09.95). We find that these objections sufficiently preserved Kentucky May's right to challenge the bargaining order before this court. The fact that the Company may not have specifically challenged the ALJ's fact findings does not mean that the issue of the propriety of the bargaining order is not before this court. Rather, the Company's failure to challenge specific facts only operates as a waiver with respect to the truth of those facts. It is still necessary for this court, even in the face of unchallenged fact findings, to determine whether the Board abused its discretion by ordering Kentucky May to bargain with the Union upon rescission of the contract.

 The Board's issuance of a bargaining order is reviewed for abuse of discretion. *See Indiana Cal–Pro, Inc. v. N.L.R.B.,* 863 F.2d 1292, 1300 (6th Cir.1988). The Supreme Court has held that, although requiring an election is the preferred remedy, a bargaining order may issue without an election in either of two situations: (1) where the employer's actions have been "flagrant" or "egregious;" or (2) where a union obtained a majority status prior to an election, but the employer's conduct, though not outrageous, "still [has] the tendency to undermine majority strength and impede the election process." *N.L.R.B. v. Gissel Packing Co.,* 395 U.S. 575, 613–615, 89 S.Ct. 1918, 1940–1941, 23 L.Ed.2d 547, *reh'g denied,* 396 U.S. 869, 90 S.Ct. 35, 24 L.Ed.2d 123 (1969).

 This court has also set forth certain requirements for issuance of a bargaining order:

(1) The Union in fact has obtained authorization cards from a majority of employees in an appropriate bargaining unit without misrepresentations or other unfair practices on its part and has requested bargaining;

(2) The employer has dissipated significantly the Union's majority by the commission of [unfair labor practices]; and,

(3) A fair election cannot be had under all the circumstances of the particular case.

*DTR Industries, Inc. v. N.L.R.B.,* 39 F.3d 106, 112 (6th Cir.1994) (citing *M.P.C. Plating, Inc. v. N.L.R.B.,* 912 F.2d 883, 888 (6th Cir.1990)). Because of the preference for election, the Board "must make factual findings and must support its conclusion that there is a causal connection between the unfair labor practices and the probability that no fair election could be held." *Id.* (quoting *M.P.C. Plating,* 912 F.2d at 888). This court typically considers other criteria as well. For example, the Board must establish that the bargaining order is the "only satisfactory remedy." *Indiana Cal–Pro, Inc.,* 863 F.2d at 1301 (quoting *N.L.R.B. v. Rexair, Inc.,* 646 F.2d 249, 251 (6th Cir. 1981)). The Board must also examine "the present effects of past coercive unfair labor practices or present coercive unfair labor practices." *United Services for the Handicapped v. N.L.R.B.,* 678 F.2d 661, 664 (6th Cir.1982) (per curiam).

Neither the ALJ nor the Board has met any of the criteria set forth above. There is no finding that the Company's actions were flagrant or egregious. There is no reflection in the record that the Union demanded recognition. There is no analysis of any dissipation of the majority by Kentucky May's unfair labor practices. In fact, Double C hired virtually all of Kentucky May's workforce, with the exception of a job or two for which Double C was not properly insured. Therefore, the majority of the potential bargaining unit was left intact after the contracting out of operations. Finally, there is no analysis as to why the Board concluded that a fair election could not be conducted.

In *Rexair, supra,* this court refused to support a bargaining order where the ALJ's decision had stated:

I am of the opinion that the possibility of erasing the effects of the Company's unfair labor practices and insuring a fair election by the use of the traditional remedy of a cease-and-desist order is slight, and that in this case the employees sentiment expressed through the authorization cards obtained by the Union would, on balance, be better protected by a bargaining order[.]

*N.L.R.B. v. Rexair, Inc.,* 646 F.2d at 250. The court noted that the Board had "failed to support its conclusion that a bargaining order is the only satisfactory remedy in the present case." *Id.* at 251. The court criticized the ALJ for "simply recit[ing] his findings of the Company's improper activities and then stat[ing] that a cease-and-desist order could not cure the wrongs." *Id.* The court concluded that "the purposes of the Act will be better served by the holding of a new election." *Id.*

Courts usually afford deference to the Board's determination of appropriate remedies because, as the *Gissel Packing Co.* court noted, "[i]n fashioning its remedies ... the Board draws on a fund of knowledge and expertise all its own[.]" 395 U.S. at 612 n. 32, 89 S.Ct. at 1939 n. 32. However, this court "has exercised less deference to the Board and scrutinized its decision more closely when it has imposed the very strong remedy of issuing a bargaining order without holding a new election." *Rexair,* 646 F.2d at 250.

In this case, the ALJ, in language much like that rejected in *Rexair,* stated in relevant part:

> that the unfair labor practices found are so serious and substantial in character that the possibility of erasing their effects and of conducting a fair election by the use of traditional remedies is slight, and the employees' sentiments regarding representation, having been expressed through authorization cards, would, on balance, be protected better by issuance of a bargaining order.

(JA, pp. 10–11). This language of the ALJ is as unsupported as was virtually identical language rejected by the *Rexair* court.

Accordingly, this court concludes that the Board abused its discretion by taking the unusual step of issuing a bargaining order. Therefore, we DENY enforcement of that portion of the Board's Order.[8]

8. In view of this conclusion, the final paragraph of the required Notice to Employees which states

## IV.

For the reasons discussed above, the Board's petition for enforcement of the Decision and Order of April 27, 1995 is GRANTED, except with respect to paragraph 2(c) of the order which directs Kentucky May to recognize the Union and bargain in good faith without an election.

that Kentucky May agrees to recognize the Union and bargain in good faith must be eliminated.