**APX INTERNATIONAL, formerly Aero Detroit, Inc., Petitioner (96–6271; 97–5954)/Cross–Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent/Cross–Petitioner (96–6520; 97–5993),**

International Union, United Automobile, Aerospace & Agricultural Implement Workers of America (UAW), Intervenor.

**INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE & AGRICULTURAL IMPLEMENT WORKERS OF AMERICA (UAW), Petitioner (96–6420),**

**APX International, formerly Aero Detroit, Inc., Intervenor,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

Nos. 96–6271, 96–6420, 96–6520, 97–5954 and 97–5993.

United States Court of Appeals, Sixth Circuit.

Argued Jan. 27, 1998.

Decided May 29, 1998.

not regularly enforced at the time of the petitioner's conviction.

Paul H. Townsend, Jr. (argued and briefed), John F. Birmingham, Jr. (briefed), Dykema Gossett, Detroit, MI, for APX International, formerly Aero Detroit, Inc.

Linda S. Neighborgall (argued and briefed), Aileen A. Armstrong (briefed), Deputy Associate General Counsel, Linda Dreeben (briefed), National Labor Relations Board, Appellate Court Branch, Washington, DC, for National Labor Relations Board.

Betsey A. Engel (argued and briefed), Associate General Counsel, International Union, UAW, Detroit, MI, for International Union, United Automobile, Aerospace & Agricultural Implement Workers of America (UAW).

Before: WELLFORD, RYAN, and SILER, Circuit Judges.

## OPINION

WELLFORD, Circuit Judge.

Petitioner, APX International ("APX"), formerly known as Aero Detroit (hereinafter referred to as "Aero"), designs and builds models and prototypes of automobiles. It has fifteen plants, four of which have collective bargaining agreements with unions. In 1991, Aero was awarded a contract by the Chrysler Corporation ("Chrysler") to manufacture fiberglass body panels for the new Dodge Viper. Initially, Aero planned to produce the Viper panels at its Lincoln Park plant, and proposed accepting new employees hired for the project to an existing bargaining unit there already represented by the United Automobile Aerospace and Agricultural Implement Workers of America ("UAW" or "the Union"). After negotiations, however, the unit members rejected the proposed contract. Consequently, Aero moved

the project to a new another facility in Madison Heights, which had no union, and began production there with 116 employees. By October of 1993, the employment reached its peak of 207.

In the meantime, during January of 1993, some Aero employees began discussing the utility of forming or joining a union. In August, Tom Mansfield and his co-worker, John Sarver, initiated a campaign to join the UAW with aid from UAW representative Baxter Marino. They distributed literature, encouraged Union support, and openly identified themselves as UAW supporters by wearing buttons and caps bearing the UAW logo or letters. By October 19, the Union had collected 160 signed authorization cards which were submitted to the NLRB.

On January 6, 1994, after much turmoil within the plant, an election was held. The results were not dispositive; the vote was 79 to 75 in favor of the Union, but there were 14 challenged and unopened ballots. Aero and the Union both filed objections to conduct affecting the election.

The Union filed three charges against Aero concerning this January 6 election, alleging that Aero violated § 8(a)(1), (2), and (3) of the National Labor Relations Act, 29 U.S.C. § 158, *et seq.* ("the Act"), which were consolidated for hearing. We summarize the facts surrounding the four main Union allegations.

## I. FACTS SURROUNDING THE CHARGES

### A. The Huddleston Discharge

Gary Huddleston was hired by Aero in December of 1992. In November of 1993, he sought to take three days off to go on a family reunion/deer hunting party.[1] Huddleston claimed that he had notified Aero at the time he was hired that he would need the time off, and that he then was told that it would not be a problem. Huddleston claimed also that he explained the trip's purpose to his first supervisor, John Moore, who did not object to his proposed leave in November. Huddleston further stated that he

renewed his request with his second supervisor, John Torres, who allegedly lost Huddleston's first completed "request for leave" form. Huddleston allegedly submitted another form.

In October, Huddleston had a new supervisor, Mike Davitt, who had been a Union supporter prior to his promotion to a management position. Huddleston stated that Davitt indicated no objection when Huddleston gave him a handwritten note, but Davitt required a written leave request. On November 1, Huddleston completed the form, but two days before he was to take his leave, Davitt denied Huddleston's request. Huddleston told Davitt he would take his leave anyway; Davitt stated that if he did, he would be treated as voluntary quit[2] and could not come back to work. Davitt claims that he was informed of Huddleston's request for leave for the first time on November 1, and that another employee in the same department also had previously tendered a request for leave for the same time period and was approved.

A determined Huddleston left work on November 12 and told his co-workers he would see them when he returned from his trip. He missed work on November 13, 15, and 16, and returned to work on Wednesday, November 17. When Huddleston reported to work, Davitt told him that he was discharged as a voluntary quit. Huddleston appealed the decision, and met with Davitt, Hendrickson, and Wagner, urging them not to treat him as a voluntary quit. He pointed out that management knew why he was absent, and that supervisors had approved the leave. Alternatively, he pleaded for a less severe sanction, which he claimed had been applied in other unexcused absence cases. Wagner, who testified that he was unaware that Huddleston was a Union supporter, noted that Huddleston had six unexcused absences and eleven instances of tardiness during his employment, but he left the final decision to Davitt. Davitt upheld the discharge as a voluntary quit. The Union filed a complaint based on Huddleston's discharge, claiming

---

1. It seems that Huddleston was not actually entitled to a vacation until after he had worked for Aero for one year.

2. The company rule provides that "Absence of 3 working days without notifying management— termination of employment (voluntary quit)."

that it was motivated by Aero's anti-union animus.

## B. Unlawful Threats and Interrogation

The Union alleged that Aero representatives made numerous unlawful statements and unlawfully inquired about Union support to employees at the plant, in violation of § 8(a)(1) of the Act. In particular, the Union cited about five instances where Aero supervisors alleged that Union representation might shut the plant down. The Union also claimed that on two occasions, supervisors asked why supporters believed that such representation was helpful or necessary. Also, supervisor Dave Doran allegedly told a supporter that if the supporter worked in his department, he would "rip that [UAW] shirt right off [his] back." The Union claimed that these improper remarks unlawfully tainted the election.

## C. The Continuous Improvement Team (the "CIT")

In September of 1993, during the Union's campaign, Plant Manager Buck Hendrickson called Mansfield to his office to discuss forming a Continuous Improvement Team ("CIT") as a way to address employee concerns and to improve conditions in the workplace without the intervention of a "third party." After further discussions, Hendrickson appointed Mansfield and ten other employees to the CIT. Hendrickson and Research & Development Manager John Moore were the self-appointed co-chairmen of the CIT. A memo was circulated to introduce the CIT to the workforce and to explain that the purpose of the program was to elicit employees' suggestions to "find more productive ways to do business." The CIT held meetings on company time, and the participants were given extra time off (but no extra pay) for their efforts. The minutes of the meetings show that various topics were addressed, including improving working conditions (providing clocks and a coat rack in the break room, organizing a phone message system, etc.), improving morale, and improving employee and management relations. By the end of February or March, 1994, however, the CIT lost momentum and faded out of existence due to employee lack of interest. In its complaint, the Union alleged that the formation of the CIT violated § 8(a)(1) and (2) of the Act.

## D. Layoff of Twenty–Three Employees

The Union filed its representation petition on October 6, 1993, and a representation hearing followed on November 15. At the hearing, Aero moved to postpone the election for three months, asserting that the size of the workforce was temporarily inflated, but would lessen substantially over the next ninety days either by attrition or layoffs. Aero's CEO, Ralph Miller, however, stated at the hearing that he was "confident that there will be few, if any, layoffs." The Union Regional Director determined that there was no sound reason for postponing the election which was scheduled for January 6, 1994.

Notwithstanding the assurances of Miller and other management officials that there would likely be few significant layoffs, Aero permanently laid off twenty-three employees on December 17, 1993. Miller maintained that the number of employees at the plant at that time was far beyond the number originally anticipated due to serious technological problems. Particularly, Aero attempted to raise the price originally quoted to Chrysler from $1,951 to $6,500 per set of panels, but Chrysler insisted that it would pay no more that $3,250. To meet Chrysler's demand, Aero contracted with another company for help. Miller claimed that efficiencies were later introduced which decreased manpower needs and, therefore, costs of production. As a result, Miller concluded that the employee force should be reduced to 180 by mid-December and 150 by mid-March. Therefore, layoffs became necessary after November. In its complaint, the Union claimed that the twenty-three employees were laid off because of their Union support and in order to chill support for the Union in violation of § 8(a)(1) and (3) of the Act.

## II. THE BOARD'S DECISION

After a hearing on October 17, 1995, the administrative law judge ("ALJ") issued an opinion finding in favor of the Union on all of the charges referred to above. She ordered Aero to cease and desist from further violating the Act, and also ordered Aero to rein-

state Huddleston with backpay, and to make whole the twenty-three laid off employees for any loss of earnings and other benefits to the date that Aero can demonstrate that they would have been discharged for legitimate business reasons. Aero also was required to disestablish the already defunct CIT. In addition, the ALJ issued a bargaining order, "such bargaining to be retroactive to October 19, 1993, the date on which the UAW attained majority support among [Aero's] employees in an appropriate unit."

Aero appealed the ALJ's decision to the Board, which upheld most of the ALJ's rulings but reversed its finding that the mass layoff was unlawful. In an opinion dated August 27, 1996, the Board found that the layoff did not violate the Act because there was insufficient evidence to contradict Aero's position that the layoffs were due to pressure from Chrysler and were not motivated by anti-union animus. The Board pointed out that the reduction in workforce was necessary due to a decrease in the metal scrap rate resulting from a more efficient production system.

The Board amended the ALJ's ordered remedy accordingly, but agreed with the ALJ that a bargaining order was necessary to remedy the other violations of the Act. Aero now appeals, claiming that the Board erred with respect to the findings regarding the Huddleston discharge, the unlawful threats and interrogations, the CIT, and the Board's order that Aero bargain with the Union. The Union cross-appeals, arguing that the Board erred in reversing the ALJ's decision regarding the twenty-three layoffs. Aero filed a brief as an intervenor in the cross-appeal, arguing that the Board's decision regarding the twenty-three layoffs was supported by substantial evidence.

In its August, 1996 order, the Board severed the "representation" part of the case and remanded it to the Regional Director with instructions to count the ballots of Biggs, Horecki, Zabik, Williams, and Huddleston, and to issue a revised tally. Thereafter, the Director first opened all but the Huddleston ballot, and all four were against the Union, making the vote exactly even at 79 to 79.[3] One week later, the Director opened and counted the Huddleston ballot which tipped the scale in favor of the Union by one vote. On October 1, 1996, the Regional Director certified the Union as the collective bargaining representative of the designated unit. Aero, however, refused to recognize the Union, claiming that the Board's certification was invalid and challenging Huddleston's ballot. Consequently, the Union filed another charge against Aero, claiming that Aero's refusal to bargain violated §§ 8(a)(1) and (5) of the Act. In its answer, Aero denied that the Union was properly certified by the Board. On July 10, 1997, the Board granted the Union's motion for summary judgment, essentially based upon the propriety of Huddleston's vote. The appeals related to both the August, 1996 order and the July, 1997 order have all been consolidated herein.

### III. STANDARD OF REVIEW

■ We review the Board's decision in this appeal to determine whether it was supported by substantial evidence. *Lion Uniform v. NLRB*, 905 F.2d 120 (6th Cir.1990) (determining that courts of appeals should apply the "substantial evidence" standard to the final agency decisions). "The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive." 29 U.S.C. § 160(e). The Supreme Court has stated: "The substantiality of evidence must take into account whatever in the record fairly detracts from its weight. This is clearly the significance of the requirement in both statutes that courts consider the whole record." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951). In determining whether the Board's decision was supported by substantial evidence, we must decide whether the Board's conclusions were reasonable in light of the facts. We "may not substitute [our] judgment on the question of whether the inference drawn is the correct one or

---

**3.** The Board sustained challenges to two of the ballots, and the parties stipulated to challenges regarding the other seven.

whether a different inference would be better supported; rather, this court is limited to the determination of reasonableness—not rightness." *NLRB v. Kentucky May Coal Co., Inc.,* 89 F.3d 1235, 1243 (6th Cir.1996) (quoting *NLRB v. Paschall Truck Lines, Inc.,* 469 F.2d 74, 76 (6th Cir.1972)).

■ The Board's issuance of a bargaining order is reviewed for an abuse of discretion. *Id.; Indiana Cal–Pro, Inc. v. NLRB,* 863 F.2d 1292, 1300 (6th Cir.1988).

## IV. *ANALYSIS*

■ Initially, we consider whether substantial evidence supports the Board's decision that Huddleston's discharge was unlawful. It is an unfair labor practice for an employer, "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization[.]" 29 U.S.C. § 158(a)(3). The Board has the initial burden of showing that an unfair labor practice was committed. If the Board carries its burden, the employer must then show by a preponderance of the evidence that it would have taken the same action even if the employees had not engaged in the protected activity. *NLRB v. Kentucky May Coal,* 89 F.3d 1235, 1241 (6th Cir.1996). If substantial evidence supports the Board's finding that the employee's union activity was a motivating factor in the employer's adverse action, that action is unlawful unless the record as a whole supports the employer's affirmative defense that it would have taken the same action in the absence of the employee's union activity. *Id.*

The Board in this case found that Huddleston's discharge was motivated by his union activity because (1) Huddleston was an open supporter of the Union; (2) he received threats of plant closure; and (3) because of the "abundant" evidence of anti-union animus on the part of Aero. The Board further found that Aero could not sustain its burden of showing that it would have terminated Huddleston even in the absence of his union activities. The Board found it significant that Aero had never before applied the "vol-

untary quit" rule to an employee who intended to return to work.

Aero argues that the Board's decision was not supported by substantial evidence, but rather was based essentially on Huddleston's uncorroborated testimony. Specifically, although Huddleston testified that he had requested and been granted the time off, no other person corroborated that story. On the contrary, Davitt testified that he denied Huddleston's request because another employee, Matt Nezich, requested leave for the same days, and he allowed Nezich to take off. Also, Torres took issue with Huddleston's version of the events relating to his request for leave.

Aero argues that there is no evidence that any supervisor recognized Huddleston as a Union supporter. Though Huddleston testified about several occasions where supervisors, including Davitt, made comments in his presence that Union representation would close the plant, the supervisors denied that such encounters ever took place.[4] The only objective evidence of Huddleston's support for the Union was his signature on an authorization card and evidence that he attended one meeting in October, 1993. Aero points out that Nezich, who obtained the leave sought by Huddleston, was also at the October meeting, indicating that he was as much a Union supporter as Huddleston. Aero would therefore not have based its decision to fire Huddleston on the fact that he was a Union supporter.

Furthermore, Aero cites to the many instances where Huddleston's credibility was called into question. For example, Huddleston represented on his employment application that he began working with Aero in December, 1992. Actually, he worked for Aero in another division, Autodynamics, from which he was discharged during his probationary period. At first, he claimed he did not know that Autodynamics and Aero were part of the same company, but when he was confronted with documents, he admitted that he had falsely represented that he had never

---

4. Though Huddleston's testimony regarding improper comments made by supervisors in his presence may support an allegation that the supervisor made improper remarks, that evidence is less probative of the issue regarding whether Aero management knew that Huddleston was, in fact, a Union supporter.

before worked for Aero in his employment application. In addition, Huddleston testified that he had never been disciplined for being absent before this incident, but, in fact, he had been warned many times. Though Huddleston had been repeatedly written up about attendance problems in the past, he claimed that he had forgotten about all of those incidents.

Finally, Aero claims that the Board erred in giving weight to the fact that no other employee had been discharged under the voluntary quit rule. Aero claims that the Board's reliance on that fact placed on Aero an unfair burden because no other employee has previously done what Huddleston did—he defied his superior in announcing his intention to be AWOL—and such conduct amounted to blatant insubordination. Rather, under these unique circumstances, Aero claims that it had a legitimate basis for firing Huddleston, who had been a less-than-ideal employee throughout his tenure.

In addressing this issue, the ALJ referred only to Huddleston's statements regarding requests for leave to go on the hunting trip; the ALJ noted no corroboration from others. Torres denied telling Huddleston he could have the leave, but added that Huddleston "defiantly told him that he would take the time off." Torres testified that he did not know that Huddleston was a Union supporter. The ALJ noted Huddleston's poor attendance and tardy record, but characterized the employer's action of discharge as "invoking an inappropriate excuse." Huddleston, according to the ALJ, "handed respondent a convenient excuse to fire him," but she found Aero's true motivation was to "be rid of an outspoken union proponent." The ALJ added that "other sanctions" would have been more appropriate than discharge. The ALJ literally brushed off Huddleston's unquestioned credibility problems, and found that Aero had applied its voluntary quit rule "in an arbitrary manner."

■ If we assume, for purposes of discussion, that the Union made out a case that Huddleston's Union activity was a motivating factor in Aero's action regarding unauthorized vacation time, we look to the totality of the circumstances in reviewing whether substantial evidence supports Aero's defense that it would have taken this action in the absence of such pro-union interest by Huddleston. *Wright Line,* 251 NLRB 1083 (1980), *enforced,* 662 F.2d 899 (1st Cir.1981). Huddleston had a poor employment record and was warned of potential further discipline for persistent lateness and tardiness by supervisor Wagner, who was unaware of Huddleston's Union proclivity, less than a month before his termination. This issue is a difficult one, but we find that substantial evidence does not support the conclusion that Aero would not have fired Huddleston in the absence of his Union support. There is no evidence that Huddleston was a leader among his ranks, nor was there evidence that his Union support was "outspoken" or particularly advantageous to the Union. Rather, the evidence strongly supports the contrary conclusion that Aero was not concerned about Huddleston's Union activity, but would have fired him in any event for his defiance toward his supervisors.

A principal problem that we have with the Board's analysis is its *ignoring of Huddleston's obvious credibility problems.* In arguing that he should have been reinstated, Huddleston insisted to the Aero supervisors that his "record was clean," and so affirmed in an affidavit filed with the Board. His record, however, was far from clean, and this was an additional, independent basis for not reinstating Huddleston. His lame excuse was that he "just forgot about [all] these disciplines" in which he had been involved, one as late as October, 1993. Huddleston's problem about credibility was also clearly evident in his misrepresentation about prior employment with Aero and the discharge during his probationary period.

The ALJ was disturbed because "sanctions other than discharge . . . were better tailored to Huddleston's circumstances." The ALJ, however, gave little weight to the clear authority of the company rule. The ALJ felt the rule was applied to Huddleston in an "arbitrary and disparate manner," despite his leaving on an unearned vacation in the face of a very plain warning by this supervisor of the consequences.

The Board points to one other occasion when a discharged employee "was reinstated after requesting his job back." We do not,

however, construe this to be a factor to be held against Aero. The record is silent about the circumstances of such employee's absence or absences, and it is silent about his prior length of service as well as his job performance, and whether or not his immediate supervisors recommended that he be re-hired. We agree with Aero that Huddleston's actions were unprecedented, and the Board's consideration of Aero's actions in other situations was inapposite. This was a first in Aero history.

We do not require that the examiner's [ALJ's] findings be given more weight than in reason and in the light of judicial experience they deserve ... The findings of the examiner [ALJ] are to be considered along with the consistency and inherent probability of testimony.

*Universal Camera Corp. v. NLRB,* 340 U.S. 474, 496, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

Under the totality of circumstances, we reach a firm and definite conclusion, after examining all of the evidence, that Huddleston would have been terminated under the applicable company rule even if Huddleston had not engaged in protected activity. *Birch Run Welding & Fabricating, Inc. v. NLRB,* 761 F.2d 1175, 1179 (6th Cir.1985). We think it unreasonable for the Board to penalize Aero for following its announced rule, known to Huddleston, simply because the Board viewed this sanction as inappropriate.

Finding that there was insubstantial evidence in the record as a whole for the Board to have rejected Aero's position that it would have discharged Huddleston for his "in your face" conduct despite warnings as to its consequence, we reverse that determination. The effect of our ruling is substantial, because Huddleston's vote is therefore rejected and is not properly counted. As a result, the election result is a tie vote, and the Union, therefore, would fail absent other circumstances. Because the propriety of the Huddleston discharge is the sole issue raised in the appeal of the Board's July 1997 order, that decision is reversed, and the bargaining order in that case should be set aside.[5]

That determination, however, does not end our inquiry, because we must also address the Board's conclusions regarding the propriety of the Board's August, 1996 order concerning the unfair labor charges that are unrelated to the propriety of Huddleston's discharge. Specifically, the Board found that Aero had committed unfair labor practices by forming the CIT and by making threats and interrogating Aero employees prior to the election. In addition, the Board found that Aero did not commit an unfair labor practice in laying off twenty-three employees in December of 1993.

■ We agree that the thirteen-member CIT was a labor organization within the meaning of the Act, and that Aero dominated that organization in violation of § 8(a)(2) and (1) of the Act. The effect of our determination, however, should be the subject of a remand in this case. In essence, the violation is a mere technical one in light of the undisputed fact that the CIT has been defunct for several years and Aero has made no attempt to revive it. The Board considered this violation in fashioning its remedies, and it particularly noted the violation as a factor contributing to its decision to issue a bargaining order in this case.

With respect to the claim that Aero unlawfully threatened/interrogated employees, the Board rejected the ALJ's characterization of the § 8(a)(1) violations to involve threats of plant closure to "groups of employees, not only by supervisors but by the highest levels of management." It concluded, however, that one such threat by Plant Manager Hendrickson was established, because he allegedly called employee Mansfield to his office and inquired about why he felt that a "third party," *i.e.,* the Union, was necessary. Also, the Board found specifically that threats made to Huddleston violated the Act. We reluctantly affirm the Board's findings in this regard.

■ Further, we find that substantial evidence supports the conclusion that Aero had a legitimate business justification for laying off the twenty-three employees. "In a case involving layoffs, ... the employer must show by a preponderance of the evidence

---

5. In letter briefs submitted to this court, the parties indicated their agreement that the Huddleston discharge was the determining factor in the appeal of the Board's July, 1997 order.

that the employees would have been laid-off even if they had not engaged in protected activity." *Birch Run Welding,* 761 F.2d at 1179. The Board explained that Aero would have laid off the twenty-three employees in the absence of the Union activities because the company had a legitimate plan to reduce its scrap rate and, consequently its costs, to be able to meet Chrysler's cost demands. For this reason, and for the reasons explained more fully by the Board in its opinion, we affirm the Board's finding that Aero did not violate the Act in effecting the lay-offs.

■ With respect to the bargaining order, we have already set aside the finding that Huddleston was discharged because he was a union adherent. We deem that to be the strongest basis proposed by the ALJ for a bargaining order. The alleged violation of creating the CIT is of little real consequence. The CIT has been effectually disbanded and had little effect on the employees' decision whether or not to vote for an independent union. The lay-off was found by the Board, and we agree, not to be based upon anti-union animus. Finally, the alleged threats of plant closure were, in essence, denied by defendant supervisors involved, with one exception, and Huddleston, the chief accuser in this regard, is a man whose credibility is suspect. In sum, these are neither compelling or persuasive bases for the extraordinary remedy of a bargaining order. The Board has not established "that a bargaining order is the 'only satisfactory remedy.'" *Indiana Cal–Pro, Inc. v. NLRB,* 863 F.2d 1292, 1301 (6th Cir.1988) (quoting *NLRB v. Rexair, Inc.,* 646 F.2d 249, 251 (6th Cir. 1981)); *see also NLRB v. Kentucky May Coal Co.,* 89 F.3d 1235 (6th Cir.1996). We find the requirements of a *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), bargaining order not to be met under the circumstances of this case. *See also NLRB v. Taylor Machine Products, Inc.,* 136 F.3d 507, 519 (6th Cir.1998).

### V. CONCLUSION

In sum, we **REVERSE** the Board's finding that the Huddleston discharge was improper for the reasons stated above. That finding requires that we **REVERSE** the Board's July 1997 order regarding the repre-sentation matter, and that we **REVERSE** and **REMAND** the Board's August 1996 order for further proceedings in a manner consistent with this opinion. We **REVERSE** the Board's bargaining order. Finally, we **AFFIRM** the Board's decision regarding the propriety of the mass layoff.