The **EXCHANGE BANK**, Petitioner,

v.

**NATIONAL LABOR RELATIONS BOARD**, Respondent.

Nos. 82–1807, 82–1933.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 7, 1983.

Decided April 16, 1984.

Wells T. Lovett (argued), Lovett, Lamar & Hutchinson, Owensboro, Ky., for petitioner.

Michael Fox (argued), Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., for respondent.

Before MERRITT, Circuit Judge, PHILLIPS, Senior Circuit Judge, and SPIEGEL, District Judge.[*]

MERRITT, Circuit Judge.

The sole issue in this appeal, as phrased by petitioner, is whether its unfair labor practices had "such a severe impact ... as to preclude the possibility of a fair election," *i.e.*, whether the National Labor Relations Board erred in ordering petitioner to recognize and bargain with the International Association of Machinists and Aerospace Workers. Petitioner maintains that a bargaining order is not an appropriate remedy because the Board's decision fails to provide adequate analysis of the continuing effects of the Exchange Bank's admitted unfair labor practices and does not explain why some lesser remedy could not redress the wrong. Petitioner also argues that there are "changed circumstances" at the Bank. We find that the Board has properly articulated its reasons for imposing the remedy, and agree that on the facts, the Board did not err in imposing the bargaining order.

## I.

There is no real dispute concerning the facts of this case or the unfair labor practices committed by petitioner. Petitioner, the Exchange Bank, is located in Mayfield, Kentucky. In early February, 1979, several of the Bank's employees approached the Bank manager and expressed dissatisfaction with their wages and working conditions. The Bank refused to meet their requests for improved wages and working conditions, and instead threatened them individually with discharge and made unlawful promises of benefits. The employees then began an organizational drive which led to the formation of the "Exchange Bank Collective Bargaining Group" on February 25, 1979. Ten of petitioner's twelve unit employees signed authorization cards authorizing the Group to represent them for collective bargaining purposes.

Learning of these developments, the Bank chairman accosted the two employees designated as president and vice president

[*] The Honorable S. Arthur Spiegel, United States District Court Judge for the Southern District of Ohio, sitting by designation.

of the Group on the following day, demanded their keys and refused to allow them to enter the Bank. Shortly thereafter six of the remaining ten unit employees left the Bank and commenced a strike to protest the unlawful discharges. The Bank hired replacements for the discharged and striking employees and on March 7 informed the Group by letter that it would not recognize or bargain with it. The following week, the strikers retained an attorney who relayed to the Bank their unconditional request to return to work; he was informed they had been permanently replaced.

Frustrated by the Bank's refusal to recognize them, eight members of the Group disbanded it on April 10 and signed authorization cards for the International Association of Machinists and Aerospace Workers (IAM). On April 25, the IAM notified the Bank of the designation and demanded recognition, but the Bank again refused to recognize or bargain with the union.

In June, an employee who had signed an IAM authorization card prepared and circulated a petition requesting a wage increase. In response, the Bank's manager summoned her to his office, where he and the Bank chairman interrogated and threatened her about her union activities and stated that her conduct had caused them to postpone instituting a merit raise system for another six months.

The ALJ and the Board found on the basis of the facts that the Bank violated sections 8(a)(1), (3) and (5) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1), (a)(3) and (a)(5) by (1) coercively interrogating and threatening employees concerning their union activities; (2) warning employees not to discuss with each other individual conversations with management regarding wages and working conditions; (3) promising wage increases and other benefits to discourage union activities; (4) creating the impression of surveillance of union activities; (5) attempting to force employees to quit because of protected concerted activities; (6) telling employees that their union activities would make it difficult for them to find employment elsewhere; (7) discharging the two Group leaders for their union activities; (8) refusing to bargain collectively with the employees' bargaining representative; and (9) refusing to reinstate the unfair labor practice strikers when they offered unconditionally to return to work at the Bank. The Board fashioned a threefold remedy for these unfair labor practices. First, the Bank was required to cease and desist from these unlawful practices. Second, the Board ordered the Bank to offer immediate and full reinstatement and lost earnings to the two discharged union leaders as well as to the six unfair labor practice strikers who were unlawfully denied reinstatement. Finally, the Board ordered the Bank to recognize and bargain with the IAM, retroactive to April 1979, and to embody in a signed contract any agreement reached. The bargaining order is the only remedy challenged by the Bank.

## II.

In *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), the Supreme Court established the Board's authority to order an employer to bargain with a union where the employer has committed unfair labor practices which "have the tendency to undermine majority strength and impede the election processes." *Id.* at 614, 89 S.Ct. at 1940. A bargaining order is an appropriate remedy if the union once possessed majority status and "the Board finds that the possibility of erasing the effects of past [unfair labor] practices ... by the use of traditional remedies, though present, is slight and that employee sentiment once expressed through cards would, on balance, be better protected by a bargaining order." *Id.* The bargaining order is an extraordinary, but sometimes necessary remedy. Without it, employers could often profit from wrongfully refusing to bargain: "The employer could continue to delay or disrupt the election processes and put off indefinitely his obligation to bargain [and] any election held under these circumstances would not

be likely to demonstrate the employees' true, undistorted desires." *Id.* at 610–11, 89 S.Ct. at 1938.

Because the bargaining order is an extraordinary remedy, we have scrutinized very closely the Board's decision to impose it without holding a new election. *See, e.g., NLRB v. Rexair, Inc.,* 646 F.2d 249 (6th Cir.1981); *Donn Products, Inc. v. NLRB,* 613 F.2d 162 (6th Cir.), *cert. denied,* 447 U.S. 906, 100 S.Ct. 2988, 64 L.Ed.2d 855 (1980). Thus, bargaining orders have not been enforced when "[t]he Board made no findings or detailed analysis as to the residual impact ... or the likelihood of recurrence, of any of the unfair labor practices," or when they are "based on conclusory statements unsupported by sufficient facts." *Donn Products,* 613 F.2d at 166. Nor have we enforced bargaining orders when the rationale offered by the Board was simply "a litany, reciting conclusions by rote without factual explication." *NLRB v. East Side Shopper, Inc.,* 498 F.2d 1334 (6th Cir.1974) (cited in *Rexair,* 646 F.2d at 251 (6th Cir.1981)).

 The Bank does not challenge the Board's specific findings that it committed "egregious and pervasive" unfair labor practices during the union campaign. Rather, the Bank contends that the Board has failed to support its conclusion that a bargaining order is the only satisfactory remedy in this case because its findings and analysis were inadequate and because of "changed circumstances" at the Bank. We disagree.

The Board's analysis in this case concentrates on "the present effects of past coercive unfair labor practices or present coercive unfair labor practices," as we required in *United Services for the Handicapped v. NLRB,* 678 F.2d 661, 664 (6th Cir.1982). The Board's decision discussed in detail the serious unfair labor practices found by the ALJ to have been committed by the Bank during the period from February to July, 1979, and concluded that "the inhibiting effects of [this] unlawful conduct will continue to linger on and will prevent the holding of a fair election in this case." The

Board observed that it was "not unmindful of the fact that ... almost 3 years have passed since [the Bank] first engaged in the conduct found unlawful herein," but explained:

> [W]hen we consider the serious nature of [the Bank's] unlawful conduct which, as noted above, consisted, *inter alia,* of threats of discharge and the discharge of the two leading union adherents, and which resulted in the dissolution of one labor organization and the attempted destruction of majority support for another, we are convinced that the lasting effects of such conduct cannot easily be eradicated by the mere passage of time.

Decision of the Board at 10 (footnotes omitted). The Board's analysis included citations to *NLRB v. Jamaica Towing, Inc.,* 602 F.2d 1100 (2d Cir.1979), which recognized threats of discharge and discharge of union adherents as "hallmark violations" justifying the imposition of a bargaining order, and *NLRB v. Pacific Southwest Airlines,* 550 F.2d 1148 (9th Cir.1977), holding that the mere passage of time is not a sufficient basis for denying the bargaining order remedy. Decision of the Board at 10 nn. 12 & 13. The Board went on to incorporate the Supreme Court's reasoning in *Gissel,* wherein the Court noted that a cease-and-desist order is not always sufficient to remedy the situation where an employer has committed persistent unfair labor practices:

> A bargaining order is designed as much to remedy past election damage as it is to deter future misconduct. If an employer has succeeded in undermining a union's strength and destroying the laboratory conditions necessary for a fair election, he may see no need to violate the cease-and-desist order by further unlawful activity. The damage will have been done, and perhaps the only fair way to effectuate employee rights is to re-establish the conditions as they existed before the employer's unlawful campaign.

Decision of the Board at 11 (quoting *Gissel,* 395 U.S. at 612, 89 S.Ct. at 1939). Finally, the Board responded to the Bank's conten-

tion that it could produce evidence that it had reinstated some of the striking employees: "[E]ven were we to accept and consider such evidence, we would find that a bargaining order is warranted. It is reasonable to assume that these employees, once having been discharged for their union activities, would be painfully aware that future support of a union could lead to the same end." *Id.* at n. 14. *See NLRB v. Naum Brothers, Inc.,* 637 F.2d 589 (6th Cir.1981) (enforcing bargaining order on similar analysis and noting, "This is the kind of analysis which the *Gissel* case mandates.").

The Bank's arguments concerning "changed circumstances" since the imposition of the bargaining order are similarly flawed. It is well established that the validity of a Board order is rarely affected by subsequent events. *See NLRB v. Katz,* 369 U.S. 736, 748 n. 16, 82 S.Ct. 1107, 1114 n. 16, 8 L.Ed.2d 230 (1962). Thus we have held that "[t]he Board need not consider events occurring after the issuance of the bargaining order," since "[t]o do so would put a premium upon continued litigation by an employer." *Automated Business Systems v. NLRB,* 497 F.2d 262, 275 n. 12 (6th Cir.1974). Factors such as significant employee turnover and offers of reinstatement alleged by the Bank need not be considered by the Board as reasons not to enforce the bargaining order. *See NLRB v. Lou de Young's Market Basket, Inc.,* 430 F.2d 912, 915 (6th Cir.1970) (even "substantial and nearly complete" employee turnover does not necessarily render bargaining order inappropriate). The "changed circumstances" themselves may well have resulted from the Bank's unfair labor practices and the failure to enforce a bargaining order which is otherwise warranted by the circumstances would permit the Bank to profit from its own wrongdoing. Moreover, as noted above, the Board correctly reasoned that even were it to consider such evidence, a bargaining order would still be justified. Given the small size of the bargaining unit and the community, it is likely that present Bank employees and indeed the pool of potential employ-

ees in Mayfield continue to be painfully aware of the price one must pay for union activity at the Exchange Bank.

The Board's analysis of the present lingering effects of the Bank's past unfair labor practices and of the reasons why a bargaining order, and not some other remedy, is necessary to remedy the wrong passes muster under the heightened level of scrutiny to which we have held bargaining orders must be subjected. Therefore, we affirm the Board's decision and enforce the order to bargain.