NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

TAYLOR MACHINE PRODUCTS,
INC., Respondent.

No. 96–6047.

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 11, 1997.

Decided Feb. 18, 1998.

David Habenstreit (argued and briefed), National Labor Relations Board, Office of the General Counsel, Washington, DC; Aileen A. Armstrong (briefed), Deputy Associate General Counsel, Peter Winkler (briefed), National Labor Relations Board, Appellate Court Branch, Washington, DC, for Petitioner.

; Ronald S. Lederman (briefed), Scott D. Norton (briefed), Anthony A. Asher (argued), Sullivan, Ward, Bone, Tyler & Asher, Southfield, MI, for Respondent.

Before: KENNEDY, JONES, and CLAY, Circuit Judges.

KENNEDY, J., delivered the opinion of the court, in which CLAY, J., joined. NATHANIEL R. JONES, J. (pp. 520–521), delivered a separate opinion concurring in part and dissenting in part.

## OPINION

KENNEDY, Circuit Judge.

The National Labor Relations Board (hereinafter, "NLRB" or "Board") petitions for enforcement of a final order against Tay-

lor Machine Products, Inc. ("Taylor") issued July 21, 1995, reported at 317 NLRB 1187, 1995 WL 437226 (1995). For the following reasons we grant enforcement, with the exception of the Board's order to recognize and bargain directly with the Union.

## I. Factual Background and Procedural History

### A. Factual Background

Taylor produces small brass and steel parts, and sells them directly to America's largest automakers, as well as to other manufacturers of parts for automakers. Taylor divides its manufacturing processes into "core" and "secondary" operations. In the core operations unit, machinists cut and shape auto parts. Approximately sixty percent of Taylor's products are sold to customers without further processing. The remaining products require additional processing in the secondary operations division. Prior to August 6, 1992, Taylor housed both the core and secondary operations in its only plant, located in Taylor, Michigan.

In January, 1992, Local Lodge 82, District Lodge 60, International Association of Machinists and Aerospace Workers, AFL–CIO–CLC ("Union") began an organizing campaign among Taylor's fifty-eight production and maintenance employees. The Union held an organizational meeting on Sunday January 26, 1992; by the end of the day, thirty-nine employees had signed a petition authorizing the Union to represent them in collective bargaining with their employer. The next day, the Union filed a petition for Board election and certification as the collective-bargaining representative for the production and maintenance employees. Pursuant to this petition, an election was held on March 25, 1992. Of the voters, thirty-one voted in favor of the Union and twenty-three

cast ballots in opposition to Union representation. Five remaining ballots were challenged and not counted.

Taylor filed timely objections, alleging that conduct by the Union and its supporters tainted the election results. On May 28, 1992, a hearing officer of the Board recommended that the election be overturned on the basis of third-party conduct. The hearing officer specifically found that in connection to the union campaign, union supporters vandalized two cars and two bicycles owned by anti-union workers. It also concluded that union supporters threatened workers opposed to unionization with physical harm and property damage. In one instance, a union supporter told a worker opposed to the union, who was wearing an anti-union button on her left lapel, that would be "the wrong place to be wearing that button if a bullet were shot." On October 15, 1992, the Board's Acting Regional Director acted on the hearing officer's recommendation, set aside the election, and ordered a new election. The Board held the order in abeyance pending the outcome of the instant unfair labor practice complaint in which the General Counsel sought an order requiring Taylor to bargain directly with the Union.

The complaint in this case, filed on November 10, 1992,[1] alleged that Taylor, through as many as nine of its officers, managers, and supervisors, committed a variety of unfair labor practices in violation of section 8(a)(1) of the Labor Management Relations Act of 1947, (the "Act"), 29 U.S.C. § 158.[2] The complaint also asserted that the following actions taken by Taylor violated section 8(a)(3) [3] of the Act: (1) the June 12 discharge of employee James Howells; (2) the July 6 discharge of employee Gene Wilson; and (3) the August 6 relocation of the secondary

---

**1.** The complaint was based on charges filed between April 9, 1992 and October 7, 1992.

**2.** Section 7 of the Act guarantees employees "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining." 29 U.S.C. § 157. In Section 8(a)(1), the Act declares that it "shall be an unfair labor practice for an employ-

er ... to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title." 29 U.S.C. § 158(a)(1).

**3.** In pertinent part, section 8(a)(3) makes it an unfair labor practice for an employer "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3).

operations machines to a new facility in Kentucky and discharge of six employees who had been assigned to operate those machines. Finally, the complaint alleged that Taylor's refusal to bargain over the transfer of secondary operations violated section 8(a)(5) of the act.[4] Respondent Taylor denied the commission of any unfair labor practices and contested the majority status of the Union.

## B. Findings and Recommendations of the Administrative Law Judge

### 1. Violations of § 8(a)(1)

In a decision dated April 12, 1994, the Administrative Law Judge ("ALJ") made findings of fact and concluded that Taylor had engaged in four separate types of conduct that violated § 8(a)(1).[5] The Board adopted the ALJ's findings and recommended remedies. We set forth the findings of fact at considerable length because of their importance to the issue of whether a bargaining order was appropriate in this case.

### a. Threats

The ALJ concluded that Taylor's owner and several of its high-level employees threatened workers in violation of § 8(a)(1). On the basis of testimony by employees Charles Warren and Elmer Ferrell, as well as former employees Bonnie Warren and Gene Wilson, the ALJ found that on Monday January 27, 1992, the day after the Union meeting, then plant manager Pat Cassiopia called employees Charles Warren and Gene Wilson separately into his office. The ALJ determined that Cassiopia told Charles Warren that "some employee was going to get fired because of the union activities" and warned Wilson that Charles Jones, the owner, "would close the doors" if the Union won the election. The ALJ found that Cassiopia, later in the same week, also called Bonnie Warren and Elmer Ferrell into his office and told them "that the shop was too small to have a union and that the doors would be closed if the employees were successful in their organizational attempt." Respondent did not call Cassiopia—who by that time had been fired by respondent—to testify. The ALJ found the unrebutted testimony of Wilson, Ferrell, and the Warrens to be credible.

The ALJ found that other management officials made similarly impermissible threats. For example, he found that machine supervisor Charles Bertram called then-employee Paul Marquess into his office on January 27, 1992 and told him that "a lot of people would lose their jobs" if the employees voted in the Union. Next, the ALJ concluded that, in the context of a discussion about Gene Wilson's support for the unionization effort, Taylor's president, David Sanders, "said something about my heart condition; that if I was to lose this job, that I would have a hard time finding another job due to my pre-existing heart condition." Finally, the ALJ found that, shortly before the August 6, 1992, layoffs, the owner of Taylor, Charles Jones, told Charles Warren that Jones knew the women who worked in secondary operations "started" the attempt at organization and that "he would take care of them too." The ALJ concluded that this conduct occurred by crediting the testimony of Charles Warren and finding that he "c[ould] not credit the cryptic, oblique testimony by Jones against the fully developed, specific, potentially decision-altering testimony by Warren." With the exception of Jones' threat to "take care of" the women in the secondary operations unit, all of these threats occurred before the Union won the election on March 25, 1992.

### b. Interrogations

The ALJ also found that, beginning Monday January 27, 1992, high-level employees violated § 8(a)(1) by interrogating Union supporters. Specifically, the ALJ concluded as follows: (1) that Cassiopia called Charles Warren into his office and asked him what he knew about the Union activities, and that

---

**4.** Section 8(a)(5), in part, makes it an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees." 29 U.S.C. § 158(a)(5).

**5.** The ALJ also recommended the dismissal of an allegation that Taylor violated § 8(a)(1) through the surveillance of its employees' union activities. This recommendation was adopted by the Board, and has not been challenged. Therefore, this issue is not before us.

Cassiopia later asked Ferrell "who had started the drive" for a union; (2) that Bertram called Marquess into his office and questioned him regarding whether union representatives had been to Marquess' house and what the organizational efforts were all about; (3) that shipping foreman Joseph Gratowski called employee Woodrow Singleton into his office and asked whether he had been contacted by the Union, and what progress had been made toward unionization; (4) that supervisor of secondary operations Ronald Perkins asked former employee Shirley Tizai, and others working around her, what they thought were the chances that the Union would succeed, and who among them would vote for the union; and (5) that quality control supervisor Kathy Ganich questioned former employee James Howells about why he would not campaign against the union and threatened that unionization could lead to a plant closure. With respect to each of these incidents, the ALJ stated explicitly that he found the testimony of the production and maintenance employee more credible than that of the corresponding supervisor.[6] Only Kathy Ganich's statements occurred after the March election.

#### c. Taylor's No–Distribution Rule

At the hearing, Taylor's president, David Sanders, admitted that in August, 1992, Taylor issued a new employee handbook that prohibited "the distribution of any and all literature ... in working and non-working areas." The ALJ concluded that this rule, by prohibiting the distribution of literature in non-work areas, was over-broad and violated § 8(a)(1).

#### d. Harassment

Finally, the ALJ concluded that Taylor violated § 8(a)(1) by permitting and condoning the harassment of known pro-union women who worked in secondary operations by two conspicuously anti-union employees, brothers Jack and Tom Holicki. The ALJ found that the brothers harassed them by throwing metal parts at the lunch room windows, suddenly making loud noises by dropping large pallets near their workstations, and interrupting their breaks to taunt them with anti-union slogans. The women reported the harassment to supervisors, who vowed to stop it but did nothing to stop it before the election. The most discipline either of the Holicki brothers received was a verbal warning issued to Jack Holicki on April 8, 1992.

#### 2. Violations of § 8(a)(3)

The ALJ then made specific factual findings and conclusions with respect to the allegations that Taylor violated § 8(a)(3) of the Act. The ALJ concluded that Taylor violated § 8(a)(3) in three manners: (1) by denying Bonnie Warren's request in March, 1992 for a leave of absence at the end of that month; (2) by threatening, interrogating, and discharging former employee James Howells; and (3) by transferring, on August 6, 1992, the secondary operations unit to a new facility in Kentucky, and then discharging six female pro-union employees in that unit.[7]

#### 3. Recommended Remedies

The ALJ recommended ordering the restoration of the secondary operations unit to the Taylor, Michigan facility. He based this recommendation upon his finding that Taylor had transferred this unit of production "in order to defeat an organizational attempt, and to avoid possibly having to fulfill a legal obligation to recognize the Union." He also rejected respondent's protest that this remedy would be unduly burdensome, finding that claim unsupported by the evidence.

The ALJ recommended the reinstatement, accompanied by the payment for any loss of earnings, of discharged employee James Howells, as well as the six women who had worked in the secondary operations division. He also recommended a cease-and-desist order requiring Taylor to refrain from violating its employees' rights under the Act, and an order requiring Taylor to post a notice assur-

---

6. As noted above, Cassiopia did not testify.

7. The ALJ recommended dismissal of allegations that Taylor's discharge of Gene Wilson violated § 8(a)(3). It found that Taylor had submitted evidence indicating that it would have fired Wilson even in the absence of his union activities.

ing its employees that it will respect their rights under the Act.

Finally, the ALJ recommended the issuance of a bargaining order. He found that a bargaining order was warranted because the Union had acquired majority strength, and because the respondent's unfair labor practices would have such a lingering prejudicial effect that they would make a fair re-run election "most unlikely." In recommending the bargaining order, the ALJ relied primarily on Taylor's August relocation of the secondary operations unit and concomitant termination of six "solidly pro union" secondary operations employees. The ALJ concluded that these actions effectively disenfranchised six of the thirty-one pro-union votes. He also noted that several high-level Taylor supervisors, including the president and the owner, had previously threatened that employees would be fired or that the plant might be closed if the Union won the election.

## C. The Decision and Order of the NLRB

The Board considered the ALJ's findings and, in an order dated July 21, 1995, adopted all of his proposed remedies, including his conclusion that a bargaining order was warranted in this case. It first reasoned that, in an election where thirty-one employees had voted for the union and twenty-three had voted against it (with five challenged ballots not being counted in the election contest), the termination of six pro-union employees "was well calculated to change the outcome of a second election." The Board then concluded that, under the circumstances of this case, traditional remedies could not dispel the "residual coercive effect" of Taylor's unfair labor practices and ensure a fair election. The Board emphasized that this case involved a large number of unfair labor practices, including threats of job loss and plant closure made by "top company officials as well as first-line supervisors." After characterizing these threats as "among the most egregious of unfair labor practices," the Board determined that the situation had been worsened

by the ensuing transfer of the secondary operations unit to Kentucky and the accompanying discharge of six secondary operations employees in Taylor, Michigan. The Board wrote:

> ... Respondent's unlawful transfer of the secondary department to Kentucky and discharge of six of its employees in order to 'take care of' those who were 'the biggest part of the [union] problem' is the sort of drastic measure certain to live on in the lore of the shop and to exert a substantial coercive effect on any employee—current or subsequently hired—considering voting for the Union in a new election; it is not likely to be erased merely by restoration of the status quo ante.

The Board adopted the rest of the ALJ's findings and proposed remedies without specific comments.[8] On August 2, 1996, the NLRB filed an application with us, pursuant to § 10(e) of the Act, for enforcement of its order dated July 21, 1995.

## II. Discussion

In its challenge to the Board's petition for enforcement of its order, Taylor raises the following arguments: (1) that the equitable doctrine of laches bars enforcement of the Board's order; (2) that the Board's determination that the termination of James Howells violated § 8(a)(3) was not supported by substantial evidence; (3) that the Board abused its discretion in ordering the restoration of the secondary operations unit to the facility in Taylor, Michigan, as well as the reinstatement of the six discharged employees from that unit; and (4) that the Board abused its discretion in ordering Taylor to recognize and bargain with the Union. Before we consider the propriety of the Board's order, two other issues require discussion.

### A. Laches

■ Taylor argues that the doctrine of laches should bar the NLRB from seeking enforcement of its order. Specifically, it argues that the delay of over one year between the Board's order and the General Counsel's

---

**8.** The Board's only significant amendment of the ALJ's decision was its deletion of the ALJ's conclusion that Taylor had violated § 8(a)(5) by re- fusing to bargain with the Union in December, 1992. This decision has not been challenged. Therefore, this allegation is no longer before us.

application for enforcement raises uncertainty as to whether turnover of employees within the Taylor facility has eroded the majority support for the Union. Taylor also asserts that circumstances have changed because Taylor has since moved the secondary operations unit from Kentucky to Tennessee.

We do not believe that the doctrine of laches bars the NLRB from seeking enforcement of its order. There is no strict limit on the time within which the Board must seek enforcement of an order under § 10(e) of the Act. *See NLRB v. Michigan Rubber Products, Inc.*, 738 F.2d 111, 113 (6th Cir.1984). While the Board does not explain why it waited over a year to seek enforcement, there is no evidence that the delay has prejudiced respondent or given the Board an unfair advantage. "Absent such a change in the relative positions of the parties the doctrine of laches will not apply." *Id.*

### B. Uncontested Findings

■ Respondent has not challenged several of the violations found by the ALJ and affirmed by the Board. Specifically, respondent has not challenged the following findings of the ALJ: (1) that Taylor issued threats to eliminate bathroom breaks and otherwise change working conditions if employees voted for the union; (2) that in August of 1992, Taylor issued an overly broad rule against the distribution of literature in non-work areas, in violation of § 8(a)(1); and (3) that Taylor violated § 8(a)(3) by denying Bonnie Warner's request for unpaid leave. NLRB asks us to accept the truth of these findings and grant summary enforcement of the portions of its order that remedy these violations.

The "failure to address or take issue with the Board's findings and conclusions with regard to Section 8(a)(1) violations effectively results in abandonment of the right to object to those determinations." *NLRB v. Kentucky May Coal Co., Inc.*, 89 F.3d 1235, 1241 (6th Cir.1996). Taylor, therefore, effectively has admitted the truth of these findings and waived its right to contest the corresponding portions of the order. *Id.; accord NLRB v. Valley Plaza, Inc.*, 715 F.2d 237, 240–41 (6th Cir.1983).

### C. Order to Restore the Secondary Operations Unit and Reinstate the Six Discharged Secondary Operations Employees

■ The Board adopted the ALJ's finding that the August 6, 1992 transfer of the secondary operations unit and the six accompanying layoffs violated § 8(a)(3) of the Act. We review respondent's challenge to this conclusion with a standard of review that provides considerable deference to the Board's findings of facts and application of law to facts. "If substantial evidence supports the Board's finding that the employee's protected activity was 'a motivating factor' behind the employer's adverse action, that action is unlawful unless the record considered as a whole supports the employer's affirmative defense that it would have taken the action in the absence of the protected activity." *NLRB v. Kentucky May Coal Co., Inc.*, 89 F.3d 1235, 1241 (6th Cir.1996) (quoting *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 395, 103 S.Ct. 2469, 2471, 76 L.Ed.2d 667 (1983)). In *Kentucky May Coal Co., Inc.*, we further explained that the Supreme Court has defined " 'substantial evidence' as 'more than a mere scintilla' and as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Id.* (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216–17, 83 L.Ed. 126 (1938)). We afford even more deference to Board determinations of credibility and will not normally set aside the Board's choice between conflicting testimony. *See NLRB v. Garon*, 738 F.2d 140, 142 (6th Cir.1984). Thus, if the record supports the Board's decision, we may not substitute our own judgment for that of the Board. *See id.*

■ Under the framework developed in *Wright Line*, 251 N.L.R.B. 1083, 1980 WL 12312 (1980), and adopted by the Supreme Court in *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983), the General Counsel bore the initial burden of "persuading the Board that an anti-union animus contributed to the employer's decision to discharge an employee." 462 U.S. at 395, 103 S.Ct. at 2471. The

employer could then assert an affirmative defense "by demonstrating by a preponderance of the evidence that the worker would have been fired even if he had not been involved with Union." *Id.*

The record, as a whole, supplies substantial evidence supporting the Board's decision that Taylor's decisions to relocate the secondary operations unit and discharge six of its employees violated § 8(a)(3) of the Act. The General Counsel presented evidence that these six employees were known union supporters. The record also shows that high-level company officials repeatedly threatened these and other employees by telling them that voting for union representation would result in some employees losing their jobs or in Jones closing the entire plant. The General Counsel presented testimony, which the Board credited, that Jones himself vowed to "take care" of the women in the secondary operations unit.

The General Counsel also offered proofs that Taylor supplied false and contradictory reasons to support its decision to transfer this unit of production to Kentucky. In a August 6, 1992 letter to the Union, Taylor claimed that it relocated secondary operations "to provide 'just in time delivery'" to customers located in the Southeast. At the hearing, however, Taylor's president, David Sanders, admitted that just-in-time delivery had no relevance to the decision to move secondary operations to Kentucky. In fact, even after Taylor had established the secondary operations unit in Kentucky, it still transported the finished products back to Michigan for inspection and subsequent delivery to customers. In an August 6, 1992 letter to its own employees, Taylor claimed that it was relocating the unit "to service the needs of [its] large customer base in that area." Sanders testified at the hearing, however, that they moved that division to Kentucky not to service existing customer base, but to establish a presence in the region.

The Board adopted the ALJ's conclusion that the threats and the false and conflicting reasons Taylor offered for the relocation indicated that Taylor was motivated by anti-union animus. We find that sufficient evidence supports the Board's conclusion that

the General Counsel bore his prima facie burden of establishing that anti-union animus contributed to the relocation of the secondary operations unit and the consequent layoff of six of its pro-union employees.

The next question is whether Taylor provided enough evidence to establish a defense that it would have made these decisions even in the absence of any protected activity. It produced evidence that it had been investigating business opportunities in the South throughout 1991, and attempted to prove that early in January of 1992 it made the decision to relocate its secondary operations unit to that region. Thus, it argues, the relocation decision predated all of the union activities and could not have violated § 8(a)(3).

The ALJ emphasized that respondent failed to provide objective evidence indicating that it was truly motivated by a desire to establish a presence in the South when it suddenly transferred the secondary operations unit to Kentucky. Although Taylor offered letters from customers stating they wanted Taylor to establish a facility in the South, the judge found that these letters, which Taylor solicited after the fact upon the advice of counsel, could have had no effect on the decision. Taylor offered no actual testimony from these customers, and the ALJ determined that the testimony of the Taylor officials was essentially uncorroborated. Taylor also introduced an informal, handwritten accounting statement which recommended that the relocation could be economical. Not only was this statement merely an economic projection (it did not even predict how long it would take for Taylor to recoup the costs of the move), it was also dated January 16, 1992, undermining Taylor's assertion that it made a final decision to relocate the secondary operations unit very early in January of 1992. Under these circumstances, the ALJ was entitled to conclude that while Taylor might have considered establishing some sort of business presence in the South before the campaign for unionization began, it did not decide to transfer the secondary operations unit until after the election on March 25, 1992. The ALJ was also entitled to conclude that Taylor failed to rebut the prima facie evidence that the deci-

sion to relocate the secondary operations unit and terminate six of its employees was motivated by a desire to damage the support of the union, in violation of § 8(a)(3).

■ Respondent also argues that the Board abused its discretion in entering the restoration order without considering whether less severe remedies could have compensated the laid-off employees. Taylor suggests that it could offer employment to these individuals in other divisions of the Michigan facility. Such a restoration order "typically is the appropriate remedy for a discriminatorily motivated change in operations." *Adair Standish Corp. v. NLRB*, 912 F.2d 854, 867 (6th Cir.1990). Taylor has failed to show that the remedy in this case would impose an undue or unfair burden. For these reasons, we grant enforcement of the portions of the Board's order requiring the relocation of the secondary operations unit and the reinstatement of the six discharged secondary operations employees.

### D. Order to Reinstate James Howells

■ We next consider the Board's decision that Taylor's discharge of employee James Howells violated § 8(a)(3), and its corresponding order requiring his reinstatement. In doing so, we apply the same standard of review and analytical approach that we employed above in our review of the other § 8(a)(3) violations.

Taylor hired Howells shortly after the election on March 25, 1992, to work as a quality control inspector. He was fired on June 12, 1992.[9] At the hearing, the General Counsel submitted the following evidence to support its prima facie burden of showing that anti-union animus contributed to Taylor's decision to discharge Howells. Howells testified that, when he interviewed for the position, he told Sanders that he would not support the Union and would cross picket lines in the event of a strike. At the hearing, Howells also stated that he often had lunch with the female employees who worked in the secondary operations unit and were

known supporters of the Union. He recounted that he told others in the quality control ("QC") division that he would not vote for the Union, but would not campaign against it. Howells claimed that at one point he went to his supervisor, Kathy Ganich, and objected to a sign reading "QC union free" that was on a desk in the quality control office. Howells expressed his concern that this sign would broadcast his lack of sympathy with the union, thereby straining his relations with those whose work product he inspected. Howells testified that Ganich told him that the sign would not be posted and then warned him that unionization would increase their cost of doing business and could force them to "have to close the plant and move it or change the name."

Howells testified that Dave Sanders told him in the middle of May that he had heard that Howells was doing a good job, but that his fortunes changed on June 12. On that day, according to Howells, Ganich called him into his office "out of the blue" and discharged him. Howells testified that she gave him four reasons for his termination: (1) that she thought he was not happy at Taylor because he had asked for a raise shortly after he started his employment; (2) that he was reluctant to "red tag" parts that did not meet specifications; (3) that he was harassing another supervisor to hire Howells' brother-in-law; and (4) that he had a lack of loyalty to the company. Howells testified that he asked her whether his lack of loyalty had anything to do with the Union, and that Ganich responded that it did not. Howells stated that he was left without any idea as to what Ganich meant by his lack of loyalty, and that he spied, when Ganich left her office, a list on her desk that contained this and the other reasons for his discharge.

Taylor attempted to raise an affirmative defense that they fired Howells for poor work performance. They relied primarily on testimony from Ganich. She stated that in May of 1992, customers returned a large number of parts manufactured in the division

---

9. Although Taylor's employee handbook does not establish an explicitly defined probationary period, it appears that only full-time employees who have worked for ninety days are eligible for health insurance, life insurance, and leaves of absence. Howells was within this ninety-day period when he was discharged.

where Howells now worked. She acknowledged that Taylor shipped these parts before Howells was employed, but stated that she "wanted to make sure that [she] had the right person in the position to prevent this from happening again." She then testified that because Howells was a new employee, she audited his performance on June 2, 1992 to make sure he was following inspection procedures. The audit revealed that Howells was only making one or two of the three rounds of inspection that were expected each day. Further auditing revealed that Howells "missed a 5–10% reject on [a] part" over the course of June 4 and June 5, and that he was not inspecting machines that had been "down" before clearing them to resume operations. Ganich testified that she memorialized the results of the audit in a memorandum to his employment file and presented these results to Howells on June 8, 1992. Howells stated that he failed to make his rounds because he felt rushed and did not have time. She testified that she responded by authorizing overtime for him if he continued to have this problem, because "we always authorize a little extra time" for, and "try to ... be as accommodating as possible with[,] a new employee."

Ganich later testified that, shortly after her meeting with Howells, she discussed her concerns about Howells with her boss, David Sanders. According to Ganich, they decided that "it was best to let him go and replace him with someone [with whom they] felt more comfortable." She testified that she summarized her concerns about Howells' performance in the following list of reasons, which she claimed she reviewed with Howells at the time of his discharge: (1) that he did not appear happy at Taylor, and asked for a raise within a week or two of starting work; (2) that a couple of his supervisors had "run-ins" with him because he acted beyond his authority in telling machine operators to make adjustments to their machines; (3) that he pestered one supervisor to hire his brother-in-law; (4) that he was a loner who was not developing good working relationships with other quality control employees; and (5) that he was not making an effort to learn Taylor's quality control system, causing him to miss large numbers of parts that should have been rejected.

Ganich testified that she told Howells these reasons on June 12, when she told him that he had been let go, and that Howells broke down and began crying. Howells expressed his fears that he would not be able to find other employment in the quality control field. Ganich testified that she told him that he had a lot of skills, but that he "was making errors and he was not following procedures." When Ganich forwarded Howells last paycheck to him, she included a letter of reference for future employers. This letter stated that Howells had "mastered the use of" eleven enumerated pieces of inspection equipment, was "familiar with inch to metric conversion and can read blueprints and shop sketches." It further stated that "James could be successful in any job that utilizes the equipment and job skills outlined." Ganich claimed that she wrote this letter because Howells had become so distraught over his chances of finding re-employment in the quality control field. Ganich denied using the term "loyalty" in Howells' exit interview.

Howells and Ganich offered conflicting testimony about whether the term loyalty was used in the exit interview, and the ALJ explicitly credited Howells' version of the events. The ALJ also concluded that the list of five reasons Ganich presented at the hearing was not the list Howells saw on her desk when he was discharged. The ALJ found that Ganich's list had been created after the fact and that the "multiplicity of reasons, itself, speaks of groping for a pretext." He discredited each of the listed reasons, first concluding that Howells' request of a raise was not alleged to have caused poor performance, and then finding the complaints by Howells' supervisors uncorroborated and not credible. The ALJ then found that Taylor's claims that Howells was a loner who did not fit in with the other quality control employees, and that he had a lack of loyalty to the company, actually corroborated the General Counsel's theory that Taylor fired Howells because they suspected him, despite his protestations to the contrary, of sympathizing with the Union. Finally, the ALJ discredited Taylor's assertion that Howells was fired for

his poor performance. Although Howells missed the 5–10% target levels for bad parts, the ALJ noted that he was not disciplined for this, and there was no evidence of additional inspection problems between the June 8 meeting and his discharge on June 12. The ALJ also emphasized that although Granich testified that they had far worse inspection problems that resulted in high part return rates in May of 1992, Taylor failed to introduce into evidence whether that inspector was discharged or disciplined. The ALJ also relied on the letter of recommendation as evidence that Howell's work performance was not, in fact, deficient.

Thus, in the eyes of the ALJ, Taylor's failure to show that other employees had been fired under similar circumstances, coupled with its reliance on several less objective reasons for discharging Howells, undermined the credibility of its defense that it fired Howells based on poor performance. In sum, the ALJ did not merely find that Taylor failed its burden of proving an affirmative defense under the *Wright Line* test, he also found that anti-union animus actually caused Howells' discharge. According to the ALJ, the evidence made "it clear that Respondent was seeking a reason to terminate Howells because he was not enlisting in Respondent's anti-union campaign and, at least, he could well be a 'Yes' vote in the pending rerun election."

Taylor relies entirely upon *NLRB v. Cook Family Foods, Ltd.,* 47 F.3d 809 (6th Cir. 1995), to support his claim that we should deny enforcement of the Board's order to reinstate Howells because he would have lost his job whether or not he campaigned for or against the union. In *Cook Family Foods, Ltd.,* the discharged workers had slowed drastically the rate at which they performed their jobs. We concluded that "the evidence as a whole admits of no conclusion other than that the [employees] would have lost their jobs whether or not they were active on behalf of the union." *Id.* at 816. We cannot reach the same conclusion in the instant case. Even though the evidence in the record could support a conclusion that Taylor might have terminated Howells because of his poor performance at work, Taylor has failed to carry its burden of demonstrating by a preponderance of the evidence that it would have discharged Howells even if it had not known of his unwillingness to campaign against the union. *See Transportation Management Corp.,* 462 U.S. at 395, 103 S.Ct. at 2471 (adopting the *Wright Line* analysis). Although it would have been illogical for Taylor to fire an employee who stated that he would vote against the Union in the pending election, the record sufficiently supports the ALJ's conclusion that Taylor believed that Howells' loyalties actually lay with the Union. For these reasons, we enforce the Board's order to reinstate Howells.

### E. Order to Bargain Directly With the Union

Taylor also challenges the Board's order requiring it to recognize and bargain directly with the Union. Under the principles enunciated by the Supreme Court in *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), a bargaining order is appropriate in two sets of circumstances. The Court stated that such an order is appropriate "without need of inquiry into majority status [of the union] in 'exceptional' cases marked by 'outrageous' and 'pervasive' unfair labor practices." *Id.* at 613, 89 S.Ct. at 1940. Both parties agree that this case does not fall into this first category. The Board, however, contends that this case falls into the second category of cases where a bargaining order is warranted: those "less extraordinary cases marked by less pervasive practices which nonetheless still have the tendency to undermine majority strength and impede the election process." *Id.* We must decide whether the facts of this case bring it within this second category.

While we utilize a deferential standard of review when considering the propriety of a bargaining order issued by the Board,[10] it is now well settled that the Board

---

10. The Court noted that "[i]t is for the Board and not the courts ... to make that determination [of whether lesser remedies will eliminate undue influences], based on its expert estimate as to the effects on the election process of unfair labor

must find that the following three requirements are satisfied before it issues a bargaining order:

1. The Union in fact has obtained authorization cards from a majority of employees in an appropriate bargaining unit without misrepresentations or other unfair practices on its part and has requested bargaining;

2. The employer has dissipated significantly the Union's majority by the commission of section 8(a)(1) violations; and

3. A fair election cannot be had under all the circumstances of the particular case.

*DTR Industries, Inc. v. NLRB,* 39 F.3d 106, 112 (6th Cir.1994); *accord NLRB v. Kentucky May Coal Co., Inc.,* 89 F.3d 1235, 1242 (6th Cir.1996) (quoting same). The third prong is the central issue in the present case. With respect to that prong, "the Board 'must make factual findings and must support its conclusion that there is a causal connection between the unfair labor practices and the probability that no fair election could be held.'" *Kentucky May Coal Co.,* 89 F.3d at 1242 (quoting *M.P.C. Plating, Inc. v. NLRB,* 912 F.2d 883, 888 (6th Cir.1990)). This causal connection requirement has also been phrased as the Board's obligation to examine the "present effects of past coercive unfair labor practices or present coercive unfair labor practices." *United Services for the Handicapped v. NLRB,* 678 F.2d 661, 664 (6th Cir.1982); *accord Kentucky May Coal Co., Inc.,* 89 F.3d at 1243 (quoting same). In the end, the Board must determine that a bargaining order is the "'only satisfactory remedy.'" *Indiana Cal–Pro, Inc. v. NLRB,* 863 F.2d 1292, 1301 (6th Cir.1988) (quoting *NLRB v. Rexair, Inc.,* 646 F.2d 249, 251 (6th Cir.1981)).

■ Although we review the Board's issuance of a bargaining order for an abuse of discretion, *see Kentucky May Coal Co., Inc.,* 89 F.3d at 1243, we nevertheless apply close scrutiny to that decision. "A bargaining order ... is an extraordinary remedy that we 'scrutinize very closely' when imposed by the Board without a new union election." *Henry Bierce Co. v. NLRB,* 23 F.3d 1101, 1110 (6th Cir.1994) (quoting *Exchange Bank v. NLRB,* 732 F.2d 60, 63 (6th Cir.1984)).

■ The Board here relied on what it considered to be a large number of unfair labor practices, including threats of job loss and plant closure made by "top company officials as well as first-line supervisors."[11] The Board found that the situation was made even worse because the threats were followed up by the transfer of secondary operations to Kentucky and the lay-off of six secondary operations employees. The Board concluded that this conduct "is the sort of drastic measure certain to live on *in the lore of the shop* and to exert a substantial coercive effect on any employee—current or subsequently hired—considering voting for the Union in a new election; it is not likely to be erased merely by restoration of the status quo ante." (Emphasis added.)

■ While we have recognized that "threats of plant closures are among the most flagrant of unfair labor practices," *Indiana Cal–Pro, Inc.,* 863 F.2d at 1301 (internal quotation marks omitted) (collecting cases from this and other circuits), nevertheless, threats of plant closure alone are not sufficient to justify a bargaining order. *DTR Indust.,* 39 F.3d at 113. We must look to "the totality of the circumstances" in our

practices of varying intensity." 395 U.S. at 612–13 n. 32, 89 S.Ct. at 1939–40 n. 32.

11. For its part, Taylor argues that many of the statements that the Board considered improper threats were actually speech that was protected under § 8(c) of the Act, which authorizes "the expressing of any views, argument, or opinion, or the dissemination thereof ... if such expression contains no threat of reprisal or promise of benefit." 29 U.S.C. § 158(c). Taylor contends that the statements found to be threats merely communicated its prediction that unionization would cause lost business from automakers that refuse to allow a unionized shop to be the sole supplier of a particular part. We agree with the Board that the statements at issue here, however, did more than predict the consequences of unionization; they communicated Taylor's willingness to retaliate against unionization by firing employees. Because the effect of these statements is reasonably viewed as coercive, they do not fall within section 8(c)'s safe haven. *See NLRB v. Pentre Elec., Inc.,* 998 F.2d 363, 369 (6th Cir.1993) (quoting *Peabody Coal v. NLRB,* 725 F.2d 357, 363 (6th Cir.1984)).

review of the Board's decision that a bargaining order was necessary.

Although the Board stated that violations would cause lingering effects, it did not explain why the other remedies that it also ordered in this case would be insufficient to dissipate the lore of the shop and would not ensure a fair election. Taylor will be required, among other things, to do the following: offer reinstatement to Howells and the six women who were discharged from their positions in the secondary operations unit; relocate the secondary operations unit from wherever it is currently located to the Taylor, Michigan facility; cease and desist from future unfair labor practices; and post a notice of the remedial steps it has taken and will take in the future. The "lore of the shop" will include not only the movement of the operation to Kentucky; it will also include the fact that the company has been required to move the operation back to Michigan. Even without a bargaining order, the Board has required Taylor to take serious remedial measures. The remainder of the Board's exhaustive and detailed order should go a long way to purge the coercive effect of Taylor's past unfair practices.

It should be noted that Taylor's threats were made before the Union won the election on March 25, 1994. Totally lacking in the Board's analysis in this case is any consideration of the Board's previous order that the union-won election had to be set aside because misconduct of union supporters rendered a free and fair election impossible. Thus, while the union had a majority of cards and a majority of votes, the Board must have concluded that there was doubt that the union had a majority of support. Otherwise, why would it have set aside the election? We have been unable to find any other case in which the Board set aside an election for union-related misconduct and then issued a bargaining order. Over five years have passed since Taylor moved the secondary operations unit and discharged seven of its employees. While the threats were made long ago, the restoration of the status quo ante through the other remedies ordered by the Board is effective and enforced now, dissipating any lingering coercive effects of

Taylor's unfair labor practices. In contrast, granting the enforcement of the bargaining order without a rerun election would have the perverse side effect of giving effect to an election that the Board already determined required invalidation because of misconduct of union sympathizers. If that conduct required invalidation of the pro-union votes, we think it an abuse of discretion to instead give effect to signature cards. Under the unique circumstances here, we therefore decline to enforce the bargaining order and compromise the employees' opportunity to vote for or against union representation in a rerun election.

## III. Conclusion

For the foregoing reasons, we grant enforcement of the Board's order with the exception of the portion ordering Taylor to recognize and bargain collectively with the Union.

NATHANIEL R. JONES, Circuit Judge, concurring in part and dissenting in part.

I concur in all of the majority's opinion except for its refusal to enforce the bargaining order instituted by the National Labor Relations Board. Although I recognize that bargaining orders are extraordinary remedies, I believe that such a remedy was appropriate in this case. The ALJ below, found among other things, that several of Taylor's high level employees threatened workers, interrogated union supporters, permitted and condoned harassment of pro-union employees, and disparately treated pro-union employees. The Board adopted all of those findings and, primarily because Taylor wholly failed to make any substantive challenge to those findings, we did not disturb them on appeal.

This court specifically found, additionally, that substantial evidence supported the Board's determination that Taylor terminated employee James Howell because of anti-union animus. We also found that the Board's determination that Taylor relocated its entire secondary operations (and consequently discharged the pro-union employees in those operations) due to anti-union animus was also supported by substantial evidence.

Given all of these findings of Taylor's numerous anti-union activities, including what many courts have found to be the most egregious act an employer can do, threatening to and actually closing plant operations, I would find that the Board's imposition of a bargaining order was well founded.

I do recognize that there were allegations of union related misconduct in this case, but the minor allegations of misconduct [1] in this case fall far below that which might necessitate a denial of an otherwise proper bargaining order. *See, e.g., NLRB v. Triumph Curing Center,* 571 F.2d 462, 476 (9th Cir.1978) (enforcing bargaining order even with "extremes of verbal abuse and serious threats of physical violence" on the part of the union, where there was no actual violence); *Donovan v. NLRB,* 520 F.2d 1316, 1320–24 (2d Cir.1975) (finding union members' mass picketing, threats, assaults and some property damage insufficient to sustain the "extraordinary sanction of withholding an otherwise appropriate remedial bargaining order"); *cf. NLRB v. World Carpets of New York, Inc.,* 463 F.2d 57, 62 (2d Cir.1972) (denying enforcement of bargaining order where union representative was arrested for physical violence, combined with a campaign of threats and intimidations designed to force cessation of business). In addition, while a substantial amount of Taylor's anti-union activities occurred before the Union won the set aside election on March 25, 1994, the most egregious occurred after that election. Therefore, I would enforce the bargaining order in this case.

---

1. There were six sustained objections made by Taylor, including two acts of vandalism, one implied threat, and one instance where a union supporter allegedly tore a union free button off an employee's shirt. J.A. at 104.