NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 04a0138n.06
Filed: November 30, 2004

**Nos. 03-1892, 03-2088**

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

BUCKEYE ELECTRIC CO.,                                )
                                                      )
    *Petitioner-Cross-Respondent*,                  )
                                                      )
v.                                                    )   ON APPEAL FROM A
                                                      )   DECISION OF THE
NATIONAL LABOR RELATIONS BOARD,                       )   NATIONAL LABOR
                                                      )   RELATIONS BOARD
    *Respondent-Cross-Petitioner.*                  )

**BEFORE:**    MARTIN, COLE, and GIBBONS, Circuit Judges.

**R. GUY COLE, JR., Circuit Judge.**  Petitioner-Appellant Buckeye Electric Co. seeks review of the National Labor Relations Board's ("NLRB" or "Board") determination that Buckeye Electric violated Sections 8(a)(1) and 8(a)(3) of the National Labor Relations Act ("NLRA"). The NLRB cross-appeals for enforcement. On appeal, Petitioner argues that the NLRB erred in determining that there was substantial evidence that the company threatened one of its former employees with more onerous working conditions because of his support for the union, and also erred in finding substantial evidence of discriminatory discharge based on the employee's support of, and membership in, the union. Because we find that there was substantial evidence of a threat of more onerous working conditions and discriminatory discharge based on union membership, we **AFFIRM** the decision of the NLRB and **GRANT** enforcement of its order.

## I. BACKGROUND

Tim McCoy worked as an electrician for Buckeye Electric ("Buckeye"), a construction contracting company. McCoy commuted to Columbus for work, a trip that was approximately 100 miles each way. On September 7, 2001, McCoy joined Local 1105 of the International Brotherhood of Electrical Workers ("IBEW"). Although the union did not have a job for McCoy at that time, the union told him to keep his job with Buckeye until it found a position for him.

On September 10, 2001, McCoy informed his supervisor at Buckeye, Scott Whitaker, that he had joined the union. McCoy explained that he would be "leaving soon" but that he would continue to work as he had in the past. He also told his project manager about his union membership. McCoy's project manager requested that he inform Rick Smythe, the company vice-president. McCoy testified that when he informed Rick Smythe of his union membership, Smythe said to him, "So, now you are going to start paying to go to work." Smythe also told McCoy that he could work through the end of the week at which point he had to leave the company.

According to McCoy, on September 11, 2001, Dick Smythe, the company president, told him that he could work for the company for as long as he wanted. McCoy thanked Smythe, explaining that he needed the job because it provided health insurance for his family. In contrast, Dick Smythe testified that he had told McCoy that he could stay one more week. Both McCoy and Smythe said that Whitaker witnessed this exchange. However, Whitaker claimed he did not hear that portion of the discussion.

Later that day, Whitaker told McCoy that Dick Smythe came to the Columbus worksite to tell McCoy that he would be working in Dayton, a change that would have added three hours to his

daily commute. Whitaker explained that the purpose of the change was to induce McCoy to quit. On September 20, Whitaker and McCoy had another conversation about Dick Smythe's desire to send McCoy to Dayton. At that time, Whitaker told McCoy that Smythe always sent workers to Dayton "when he finds out somebody's in the IBEW." This conversation was tape-recorded. At no point did anyone actually tell McCoy he would have to work in Dayton.

On September 12, McCoy received union stickers and guides to pass out to other workers. He placed the stickers on his hardhat, which he left in Whitaker's office. Dick Smythe testified that he knew about the stickers. On September 17, the union faxed the nonunion salting form to Buckeye, identifying McCoy as a union member. On September 20, McCoy passed out the union guides during a lunchbreak.

Later in the day on the 20th, Rick Smythe informed McCoy that his last day would be September 21. Smythe told McCoy that he had given two weeks notice and that this termination was the company's response. McCoy turned in his keys and left.

The NLRB held a hearing and concluded that Buckeye violated Section 8(a)(1) of the NLRA by threatening McCoy with more onerous working conditions, as well as Section 8(a)(3) and (1) by discharging McCoy based on his union support and membership. 28 U.S.C. § 158(a)(1); 28 U.S.C. § 158(a)(3). The NLRB affirmed. This appeal followed.

## II. ANALYSIS

*A. There was Substantial Evidence that Buckeye Threatened McCoy with More Onerous Working Conditions.*

The NLRB found that Buckeye violated section 8(a)(1) of the NLRA by threatening McCoy with more onerous working conditions. We review the NLRB's findings of fact for substantial evidence. *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 487-88 (1951). So long as there is substantial evidence, we do not reverse the Board even if we would reach a different conclusion were we to review *de novo*. *Id.; see also Torbitt & Castleman, Inc. v. N.L.R.B.*, 123 F.3d 899, 906 (6th Cir. 1997) (holding that evidence that a statement is a threat should not be set aside because a "different inference or conclusion may seem more plausible").

The NLRA guarantees employees "the right to self-organization, to form, join, or assist labor organizations . . . ." 29 U.S.C. § 157. Section 8(a)(1) makes it an unfair labor practice "to interfere with, restrain, or coerce employees in the exercise of [those] rights . . . ." 29 U.S.C. § 158(a)(1). An employer violates Section 8(a)(1) by threatening more onerous working conditions because an employee supports a union. *Chef's Pantry, Inc. v. N.L.R.B.*, 654 F.2d 458, 459 (6th Cir. 1981).

In this case, there was substantial evidence to support the Board's finding. McCoy testified that Whitaker told him that Dick Smythe planned to transfer him to Dayton in the hope that McCoy would quit. Whitaker did not deny that this conversation took place. Petitioner argues that since no one actually told McCoy that he would have to work in Dayton we must reverse the Board's finding. We disagree. The statute does not require actual action, only a threat. Whitaker's statement alone constituted a threat.

It was not unreasonable for the Board to believe McCoy's testimony on this point. The NLRB makes credibility determinations which this Court may overturn only if "inherently unreasonable or self-contradictory." *Wright Tool Co. v. N.L.R.B.*, 854 F.2d 812, 815 n.1 (6th Cir.

1988). The NLRB credited McCoy's testimony that Whitaker had told him Dick Smythe planned to transfer him to Dayton. Whitaker did not deny this testimony and there is no contradictory evidence on this point. Although Dick Smythe testified that he did not plan to send McCoy to Dayton, our analysis is unchanged. The truth of the substance of the threat is irrelevant. It is only important that a threat was made. McCoy's testimony, in combination with the tape-recorded conversation in which Whitaker explained that Smythe routinely sends workers to Dayton to induce them to quit, was sufficient to provide substantial evidence for the Board's finding that Buckeye threatened McCoy with more onerous working conditions.

*B. There was Substantial Evidence that Buckeye Discharged McCoy Because of Union Support and Membership.*

The Board also found that Buckeye violated sections 8(a)(1) and 8(a)(3) of the NLRA by discharging McCoy based on union support and membership. 29 U.S.C. § 158(a)(1), (a)(3). Motive is a factual question. We therefore review the Board's determination for substantial evidence. *N.L.R.B. v. Taylor Mach. Prods., Inc.*, 136 F.3d 507, 514-15 (6th Cir. 1998).

Section 8(a)(3) of the NLRA bans "discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3). Section 8(a)(1) states that it is an unfair labor practice "to interfere with, restrain, or coerce employees in the exercise of [their statutory] rights . . . ." 29 U.S.C. § 158(a)(1). When an employer discharges employees to discourage union activity, such action violates both Section 8(a)(3) and Section 8(a)(1). *Taylor Machine*, 136 F.3d at 511-12.

Discriminatory discharge is proven through a burden-shifting scheme. The employee bears the initial burden to show that protected conduct was a substantial or motivating factor in the discharge. *Id.* at 514. The burden then shifts to the employer to prove an affirmative defense by a preponderance of the evidence. *Id.* at 515.

In this case, there was evidence that protected conduct was a substantial or motivating factor in the discharge. First, there was substantial evidence that Buckeye had knowledge that McCoy had joined a union. McCoy informed his supervisor, his project manager, the vice-president, and the president that he had joined the union, and he wore a union sticker on his hard hat. The company president testified that he was aware of this sticker. McCoy openly handed out union literature to other employees. In addition, the company received a letter on September 17 that specifically identified McCoy as a union member.

There was also evidence that Buckeye was hostile towards union activity. Whitaker told McCoy, in a tape-recorded conversation, that Dick Smythe generally says that he will relocate employees to Dayton, a longer commute, to induce them to quit when the Smythes learn of union membership. This evidence strongly suggests that Buckeye was, in fact, hostile towards union activity. Thus, the NLRB correctly determined that there was substantial evidence of hostility towards union activity.

Third, McCoy's discharge occurred shortly after he announced that he had joined the union. Proximity in time can be a reliable indicator of intent. *W.F. Bolin Co. v. N.L.R.B.*, 70 F.3d 863, 872 (6th Cir. 1995). The phone call informing McCoy that his "last day" would be September 21 occurred on September 20, just three days after the company received the letter stating that McCoy

had joined the union. In addition, the call came on the same day that McCoy started handing out union literature. The Board reasonably inferred that this proximity in time supported a finding of discriminatory discharge.

Buckeye defended its actions by arguing that McCoy had resigned. Buckeye said that his statement that he "would be leaving soon" effectively constituted his two weeks notice. The Board's determination that Buckeye did not prove this defense by a preponderance of the evidence was based on a credibility finding. McCoy testified that he made clear that he intended to stay with Buckeye until he obtained a new job with the union. The Board's determination that McCoy was more credible was not inherently unreasonable, and was supported by the evidence.

As a result, this Court finds that there was substantial evidence to support the NLRB's determination that Buckeye discharged McCoy in a discriminatory manner in violation of sections 8(a)(1) and (3) of the NLRA.

### III. CONCLUSION

For the reasons stated above, we **AFFIRM** the decision of the NLRB and **GRANT** enforcement of its order.